THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ROBERT F. HILL, PLAINTIFF IN ERROR.

Argued December 3, 1900—Decided December 7, 1900.

1. A confession of a prisoner, made to an officer, after the following undisputed conversation had with the prisoner before it was made, viz.: "I told him I was an officer, asked him first if he knew me,

and he said yes, he ought to know me, he knowed pretty near all the police officers. I said, 'Well, I am an officer; you don't have to tell me anything if you don't want to.' I says, 'What you tell me the court might ask me,' and he said, 'Well, you are a friend of mine, you don't have to say all that I tell you,' " is admissible in evidence on the prisoner's trial for murder. It does not violate the rule established by this court in Roesel *v.* State and Bullock *v.* State.

2. When a confession of the prisoner is proposed to be offered by the state it is within the right of the counsel of the prisoner, before the confession is admitted, to examine fully the witness who proposes to testify to the confession as to all the circumstances surrounding the alleged making of it.

3. The defence may also call and examine, to aid the court in passing upon its admission, independent witnesses who may know of the circumstances surrounding the making thereof, or of the physical or mental condition in which the prisoner was at the time the alleged confession was made.

4. Where, however, the state has laid a foundation for the admission of a confession made to a magistrate or officer by proof that it was made by the prisoner without promise or threat, that is, that it was voluntarily made, then a basis is laid for the court to admit the testimony and it should be admitted unless the counsel of the prisoner asks leave to examine the witness about to testify, or to put in other evidence, or both, relative to the facts and circumstances surrounding the making thereof.

5. The law always presumes a man to be conscious and sane, and if the contrary exists, thereby defeating the natural presumption, it must be shown by the party who alleges it.

6. Cartridges (loaded shells) in a small paper package taken from the pocket of a coat found in the room where the shooting occurred, immediately after the shooting, and which fitted the pistol used by the prisoner, were properly admitted in evidence by the court, under the circumstances disclosed in this case, as a part of the *res gestæ.*

On error to the Court of Oyer and Terminer of the county of Camden.

For the plaintiff in error, *Frederick A. Rex* and *Howard L. Miller.*

For the defendant in error, *Frank T. Lloyd,* prosecutor of the pleas.

The opinion of the court was delivered by

FORT, J. . The plaintiff in error was indicted in the Court of Oyer and Terminer of the county of Camden for the murder of his wife, Edith Hill. On a traverse of the indictment the jury found him guilty of murder in the first degree, and, upon that conviction, sentence of death was pronounced.

By the writ of error in this case the entire record is brought to this court for review, pursuant to the statute. *Pamph. L.* 1898, *p.* 915, § 136. To the charge there was a general exception taken and several exceptions to the admission of evidence. The assignments of error and reasons for reversal, however, have not been confined to the exceptions, but have been made to various admissions of evidence and rulings by the court, to which no exception was taken at the trial. This is pursuant to the provision of our Criminal Procedure act, which permits such a specification of causes for relief or reversal upon writ of error in criminal cases where the trial justice shall certify that the record brought up is the entire record in the cause. *Pamph. L.* 1898, *p.* 915, §§ 136, 137.

It will be necessary, in determining the questions here argued, to consider but two of the assignments of error, as all the others are without substance, and at the hearing only these two points were seriously relied upon by counsel for reversal.

The fourth assignment of error is founded upon the admission by the court of the confession of the prisoner to John Anderson. Anderson was a police officer of the city of Camden, and was placed in charge and as guard of the prisoner after the shooting and while he was in the hospital suffering from a wound self-inflicted. The testimony so objected to is as follows:

"*Q.* You are a police officer?

"*A.* Yes, sir.

"*Q.* Do you know the defendant, Robert Hill?

"*A.* I did not know him until the night I was sent there to take charge of him.

"*Q.* Where were you sent to take charge of him and when?

"*A.* Sent to the hospital the night this occurred.

"*Q.* Did you have any talk with him the next day?

"*A.* Yes, sir.

"*Q.* What time in the day?

"*A.* Why, between the hours of eleven o'clock in the morning and seven at night, Sunday.

"*Q.* What was the subject of his conversation?

"*A.* Why, the first thing I told him——

"*Q.* Now, just tell me what the subject of your conversation was?

"*A.* Why, the trouble he and his wife had.

"*Q.* Before he said anything to you upon that subject, did you say anything to him by way of caution?

"*A.* Yes, sir.

"*Q.* And if so, what?

"*A.* I told him I was an officer; asked him first if he knew me, and he said yes, he ought to know me, he knowed pretty near all the police officers; I said, 'Well, I am an officer; you don't have to tell me anything if you don't want to;' I says, 'What you tell me the court might ask me;' and he said, 'Well, you are a friend of mine; you don't have to say all that I tell you.'

"*Q.* What reply did you make to that?

"*A.* I didn't make him no answer.

"*Q.* Now, after that, what did he say about the thing itself?

"*A.* Why, I asked him who shot his wife; if he did? He said, 'Yes;' I asked him whereabouts he stood in the bedroom; asked him where he got the gun from, and he said out of his pocket; I asked him if he put it in his pocket for that special occasion, and he said no, he usually carried a gun whenever he went out.

"*Q.* What else?

"*A.* I asked him why he did it, and he said he was jealous of his wife; jealous of her.

"*Q.* Was that the whole of his conversation?

"*A.* Yes, about all the conversation."

The rule governing the admission of confessions by prisoners, when made to a magistrate or police officer, was settled by this court in *State* v. *Roesel,* 33 *Vroom* 216, and it would

be useless to restate it here. To the same effect is the decision in *Bullock* v. *State, ante p.* 557.

While it is alleged here that the confession was made by the prisoner when he was not competent to know of what he was speaking, still no offer is claimed to have been made by his counsel to prove that such was his condition before the court admitted the confession. When a confession is offered by the state in a criminal case, it is the right of the counsel of the prisoner, before it is admitted, to cross-examine the witness who proposes to testify to it as to the circumstances surrounding the making of it, and the defence may also call, at the same time, independent witnesses and examine them, going thoroughly into the whole matter as to how the confession came to be made, the parties present, the physical condition and state of mind of the prisoner at the time it was made, and then the court, with all these facts before it, is to pass upon its admission.

In this case no offer was made to show the condition of mind or body alleged to have existed in the prisoner at the time the confession was made. It is too late to raise such a question on error in this court, when no attempt was made in the court below, to prove facts which, if they existed, must have then been within the knowledge and ability of the prisoner to establish. The law always presumes a man to be conscious and sane, and if the contrary exists, thereby defeating the natural presumption, it must be shown by the party who alleges it. The condition, mental and physical, of a prisoner at the time of the alleged confession, if shown to the judge, may very materially affect his decision upon the question of its admission, and the prisoner has the right to have it all disclosed before the court passes upon it; but it is not essential to the state's case for it to bring out such facts in the first instance.

As to the confession admitted in this case and here under review, we think that while the preliminary testimony of the circumstances surrounding the making of it may not have been shown as fully by the state as should always be exacted by the court before admitting a confession of the prisoner in

a homicide case, still it discloses, by the testimony of the officer himself, unshaken by any cross-examination of the prisoner's counsel, and uncontradicted by any other evidence, that he said to the prisoner before he made the statement to him: "Well, I am an officer; you don't have to tell me anything if you don't want to; what you tell me the court might ask me." No promise was held out by the officer, nor was any threat made; the confession seems to have been voluntary, and that is all that is required to be proven by the state to lay the foundation for its admission.

It is the safer rule for the court, in cases where the life of a prisoner is at stake; to require a complete disclosure of all the facts and circumstances surrounding the confession, and to call upon the counsel of the state and of the prisoner to give to the court the fullest information possible to aid the court in its decision upon the admission of the testimony, but no adjudication in this state so requires as a preliminary requisite to its admission.

In this case there was no question, under the evidence, about the fact of the guilt of the prisoner of the crime of murder in the first degree. The shooting was undoubtedly done by the prisoner, and he was the only person in the room with his wife at the time the shooting occurred. He fired four shots at his victim, all of which took effect, and any one of which, it would appear from the evidence, would have probably proved fatal. The only effect of the testimony in this confession was to furnish additional evidence upon which to fix the degree of the crime as that of the first degree. But irrespective of this testimony, it would be impossible to conclude, under the evidence in this case, that sufficient premeditation and deliberation did not exist, from the use of a deadly weapon and by the firing of the four shots that were fired by the prisoner, to make it a clear case of first degree. Intent to kill is, beyond any question, established by this testimony. There is other testimony in the cause proving statements by the prisoner, prior to going to the house of his victim, indicating that he intended to take her life as well as his own; and he did take her life and

attempted to take his own. The trial court would have been justified in marshalling before the jury the facts which go to establish premeditation in this case in a much stronger light than it did.

The only remaining question is the admission in evidence by the court of some loaded shells, which, it is alleged, were taken from the pocket of a coat found in the room in which the prisoner committed the murder. The proof was that these shells were in a small paper bag, which paper the prisoner identified as similar to one which he obtained with cartridges, like those found therein, at a store in the city of Camden, and it also appeared in evidence that those cartridges fitted the pistol used by the prisoner to kill his victim.

The ground upon which objection was made to the admission of those shells was that there was no proof that the coat from the pocket of which they were taken was the coat of the prisoner. The coat itself was not offered in evidence; the prosecutor says by inadvertence. It appears, by the testimony, that the prisoner had been an employe of the ferry company, and that as such he wore a blue suit, and that, on the day of the murder, when arrested he was in his shirt sleeves, with only his pants and vest upon his person. The pants and vest which he had on were blue and of the kind worn by ferrymen, and the coat found in the room was a ferryman's coat. No other coat was found in the room, and the prisoner did not go upon the stand and testify that this was not his coat from the pocket of which the shells were taken. The presence of this coat in the room at the time of the murder would have made its introduction in evidence and use by the state competent as part of the *res gestæ,* if the state had elected to have offered it, and we think that any article found in the room at the time of the murder, which can be traced to the prisoner, and which may have been in anywise connected with the murder, or which may in anywise show his state of mind and intent, could be introduced in evidence. While it would have been wiser for the state to have offered the coat in evidence, still we think the contents of the pocket of the coat could be admitted in evidence with-

out the introduction of the coat itself. *Commonwealth* v. *Sturtevant,* 117 *Mass.* 122; *Hodge* v. *State,* 38 *Am. Rep.* 146; *People* v. *Johnson,* 140 *N. Y.* 350; *State* v. *Stair,* 56 *Am. Rep.* 449.

At any event, in view of the fact that the room was immediately guarded after the arrest of the prisoner, and that the officers who guarded the room until the paper with the cartridges therein was taken from the coat pocket testified that no change was made in the articles in the room, and in view of the fact that the prisoner was arrested without a coat, and of the proof that he entered the house just before killing his victim with a coat, and of the fact that notwithstanding it was within the power of the prisoner to have proven that this was not his coat from which the cartridges were taken if he had wished to disprove it, and that he did not do so, although he was examined as a witness in the cause, we do not think that the admission of this testimony was such error as would justify a reversal. There seems to be no reason why the coat was not offered in evidence, and there is no pretence on the part of the prisoner that he called for or demanded the production of the coat, or insisted that the state should or should not put it in evidence, and he should not be permitted here, under these circumstances, to question the failure to introduce that additional piece of testimony. To sustain this contention would be to reverse because the state did not introduce more damaging evidence than it did, even when that offered and rightly admitted justified the conviction. This would, to say the least, be a novel theory for a reversal.

We can find no error in the record, and the conviction is affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, VAN SYCKEL, DIXON, COLLINS, FORT, GARRETSON, BOGERT, HENDRICKSON, ADAMS, VREDENBURGH, VOORHEES. 12.

*For reversal*—None.