THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ALLISON M. MacFARLAND, PLAINTIFF IN ERROR.

Argued March 18, 1912—Decided June 20, 1912.

1. A husband was convicted of the murder of his wife by the administration of poison. The evidence was circumstantial. The state introduced a series of letters found in the possession of the defendant, in which the writer, an unmarried woman, expressed the most passionate love for him and a confident reliance upon his promise to marry her as soon as he got rid of his wife by a divorce. *Held*, that the letters were properly admitted to show a motive for the crime and to repel the presumption arising from the matrimonial relation; but that it was error to permit their use as evidence that the defendant had in fact said that he would soon get rid of his wife by a divorce.

2. Letters written to a person, though evidence against him for some purposes, are not evidence of the truth of their contents unless besides the mere possession of the letters there is testimony from which acquiescence in the truth of their contents can be inferred.

3. The truth of oral statements made to a person may be admitted by his silence, but the rule is otherwise as to written communications, hence the failure of a person to reply to a statement made in a letter, or the absence of proof that he did reply, is not an admission of its truth.

4. The case of *Hand* v. *Howell*, 32 *Vroom* 142, 694, followed.

On error to the Essex Oyer and Terminer.

This writ of error brings up the conviction of Allison M. MacFarland of murder in the first degree. The jury found that the plaintiff in error willfully caused the death of his wife by placing a bottle of poison where she would take it by mistake and that she did so take it with fatal results. The conviction rests upon circumstantial evidence which, apart from certain letters written to the defendant, consists chiefly of statements made by him, first to the doctor whom he called in, then to the county physician and afterwards to the officers of the law. The written statement that follows, which was procured from him by the officers at about the same time, presents in consecutive form the substance of the testimony thus adduced.

MacFarland was advertising manager for the Crocker-Wheeler Company and had gone to New York on the afternoon of Tuesday, October 17th, 1911, on business for his company taking with him his son Robert and remaining over night. After they had gone Mrs. MacFarland wrote a letter to her parents telling them of the events of the day, speaking affectionately of her husband and saying that "Robert and Mac (her husband) are in New York." Within a few hours after writing this letter she took the poison that caused her death. From this point the statement referred to takes up the narrative.

"Oct. 19-11.

"Statement made by Allison M. MacFarland.

"I went over to New York on Tuesday afternoon one o'clock something. I took the little fellow along for an outing, and we went on business for the Crocker-Wheeler Company. I went to the New York office of the company and went to the office of the Delaval Separator Company, and other places. When night came we went up to the St. Paul Hotel on Columbus avenue and Sixty-ninth street, and we stopped there over night. I have done this same thing before. We had breakfast the next morning and then came back home getting off at Roseville station. We arrived at the house about ten o'clock

in the morning, on the morning of the eighteenth day of
October. When we arrived home, I went right upstairs to the
toilet, the doors leading from the bath room afford a view to
the room where my wife slept, and I looked in and saw the
baby running around in its night dress. I then went in and
the child was standing by the mother's side. My wife was
lying on the bed the condition of affairs such as to take my
attention immediately to say that the first glance in the room
satisfied me that there was something wrong. I am not
familiar enough with death for certainty and I went for the
doctor knowing that it was beyond my help. My little boy
was down stairs and I did not want him to come up and I
took my baby down stairs with me. I went out and found
Dr. Gale and I brought him to the house with me and he in-
formed me that she was dead and had evidently been dead for
some time. We spoke about the death and I wondered if she
might have got hold of something that might have caused her
death. The doctor asked me if she could have got hold of
something which might have caused her death. The doctor
looked around the room to see if he could find anything, and
he opened the medicine chest to see if he could find anything.
I asked the doctor if he knew the cause of death and he replied
it might be poison or heart failure, and the doctor asked me
if there was anything around of a poisonous nature, and we
looked over the tables and in the medicine closet and I pointed
out everything that I thought was of a poisonous nature in-
cluding carbolic acid, solution of cyanide, solution of mor-
phine and pragnats of potassium. The doctor's attention was.
called to them. The cyanide of potassium was got at the
Crocker-Wheeler plant; we have this for photographic pur-
poses. I went into the room where the potassium was kept
and I took it from the shelf. Mr. Eymer did not know that I
took it. I did not think it was of any consequence as that can
be procured anywhere. It was kept on a shelf and I had access
to that department. I did not think it was necessary to ask
Mr. Eymer, I would have asked him if he was there. What
I brought home was in a paper—I am not certain but I placed
it in an envelope and placed it on a shelf in the medicine

closet. I called my wife's attention to it and told her I brought you some cyanide and I put it up here, later on I mixed it up. I was looking up for a suitable bottle on the shelf and I noticed the bromide bottle that had not much in it and rarely used and I poured it out into a smaller bottle and put the cyanide in the larger bottle; after putting it in the bottle I put a label on it marked 'Poison Cyanide Solution,' and left it on the shelf which was the most secure place in the house for it, on the top shelf. So far as I know no one but myself touches these bottles, as the shelf was filled with bottles of unknown articles which were left by the former occupant. The bromide was not an article that my wife ever used of herself, as far as I know; I had given it to her on several occasions, not more than three or four times since we lived there, that is what it was used for; so far as I know she had never mixed any for herself and I had no idea she would ever be looking for it herself, as she knew nothing about it. To the best of my judgment the bottle being plainly labeled poison and being in an out of the way place in company with other poisons and other unknown mixtures was not a risky place to place it there. Some of the crystals were left and it's my impression that I threw all this surplus into the toilet bowl, but I am not certain about it. I only brought cyanide from the factory this one instance.

"Above is substantially correct.

"A. M. MacFarland."

On this writ of error we are not concerned with the strength or weakness of the state's case but solely with the legal effect of certain letters that were found in the possession of the defendant.

The state claimed as the motive of the defendant in the murder of his wife his illicit love for another woman, in order to marry whom it is claimed that he formed the design of getting rid of his wife. A number of letters written to him expressing ardent love and a confident reliance upon his promise of a speedy marriage when he should have got rid of his wife by divorce were put in evidence by the state. These

letters having been submitted to the jury, two questions arise:
1. Were the letters admissible in evidence? 2. Were they
evidence of the truth of their contents?

For the plaintiff in error, *McDermit & McDermit* and
*Chauncy H. Beasley.*

For the defendant in error, *Wilbur A. Mott,* prosecutor of
the pleas.

The opinion of the court was delivered by

GARRISON, J.   The letters were properly admitted in evi-
dence. They were found in the possession of the defendant;
they proved that the declarations they contained had been
communicated to him; they were sent to and received by him
at different places, which shows intercommunication; they
expressed the passionate love of the writer for the defendant,
and her urgent desire to become his lawful wife. The defend-
ant himself told a witness, who testified for the state, that
the writer of these letters was a young lady in Philadelphia
who lived next door to him while he was in that city, and
whom he had taken into his office, in order to become better
acquainted with her, and that they had become intimate. He
also imparted to this witness the secret meaning of certain
characters used in the letters, the signification of which, as
explained by him, denoted the greatest degree of intimacy
possible between a man and a woman.

We entertain no doubt that the letters were admissible in
evidence for the purpose claimed by the state, viz.: "To
repel the presumption arising in favor of the prisoner from
the fact that the deceased was his wife and to show a motive
for the commission of the crime."

When we pass, however, to the question whether the letters
were competent evidence to prove the truth of their contents
we come to a totally different and far more difficult question.
The transition marks not only the difference between the
proof of a communication and the proof that it was true;
but also the difference between the proof of a motive for a
crime and the proof of a substantive fact in the chain of

incriminating circumstances that connects the defendant with the commission of the crime.

The knowledge that the writer of the letters intensely desired and confidently expected to become his wife, as soon as by a divorce he was free to marry her, may have operated upon the defendant's mind as a motive to the commission of the crime of which he was convicted; as also may the urgency of the writer that such divorce be obtained quickly as something that the defendant had promised to do and to do soon; while the mere fact of an intimacy that permitted of such communications was of itself evidence to rebut the presumption arising from the matrimonial relation. But to say that these letters, because preserved by the defendant, proved that he had said that he would in a short time be free to marry the writer and that he would soon get rid of his wife by a divorce is an assumption of a totally different character, involving the broad proposition that letters addressed to a party and found in his possession are evidence that he had in fact done or said the things that the writer of the letters stated that he had done or said. That this evidential force was accorded to these letters at the trial appears from the instructions under which the claim made by the state was submitted to the jury.

The claim made by the state was put before the jury in the following language of the charge:

"The state claims to have proved that the death of this woman was brought about, not by the criminal carelessness of the defendant, but by his intentional act. And it claims that the circumstances which have been laid before you demonstrate to a moral certainty that the purpose of the defendant in doing what he did, in bringing this cyanide to his home after his wife had come back to live with him, and so shortly after that occurrence; that his placing it in the bottle which contained medicine which his wife used with more or less frequency, and leaving that bottle in the position which it occupied when his wife was using it, and putting the bromide in another place, coupled with the fact that at that time he was carrying on a liaison with a woman in Philadelphia, who,

from the letters which have been exhibited in this case, would seem to have become thoroughly persuaded that in the near future the situation would be such that he would be free to marry her, leaves no escape from the conclusion that the death of this woman was intended to be, and was, accomplished by this man for the purpose of clearing the way for the putting into execution of the promises which the state claims these letters show he had made to this woman in Philadelphia. These letters, as I have already intimated before, I think, are, as the state claims, the keystone of the case which it has sought to make against the defendant. The state claims that they not only show a motive existing in the mind of the defendant for taking his wife's life, but a motive which is fully adequate; that motive being complex; the desire to continue his relations with this girl in the future as they had existed in the past, and the continuance of which it would seem, from one of the last of the letters which she wrote to him, was threatened by her to be terminated. I speak of the letter in which she was arranging to meet him in New York, and said that that was the last occasion upon which there would be any 'stolen fruit' to be enjoyed by them. The desire, I say, for a continuance of those relations, and a belief that, unless his wife was put out of the way, those relations would be terminated; and, further, the desire to redeem, to some extent, the promise made by him to this girl in Philadelphia that in the near future she should be his wife.

"It is for you to say whether, in view of these facts to which I have referred, the state has sustained the burden which, as I pointed out to you in the beginning of my charge, the law imposes upon it."

The use of the letters by the jury as evidence to sustain these claims of the state was treated in the charge as follows: "Most if not all of her letters to him refer apparently to things that he has said or written to her, and the contention of the state is—and it is for you to say how far it is justified—that it is to be inferred that the things which those letters state have been said or written by him to her, were said or written by him."

That this was an instruction to the jury to use the letters as evidence to determine whether the state had proved what it claimed is rendered clear by the concrete illustration that followed.: "That is, that the declaration that he had promised to divorce his wife and that in the days not long before his wife's death he had promised that the divorce should be obtained soon and that he would soon be in a position to make this girl his wife must be inferred from the statements in those letters from her to him which he apparently treasured and kept under lock and key. It is for you to say * * * how far you are forced to the conclusion that he did make these promises which are asserted in these letters from this girl to him."

This instruction is not modified by the general language, "After a consideration of all the evidence and giving every fact its whole significance, it is for you to determine whether the state has made out the case which it claims to have made out, that is, a case of murder of the first degree."

The jury was therefore instructed that they could find from the letters themselves that the assertions contained in them were true. This was clearly erroneous unless letters written to a person are, by the mere fact of their possession, proof of the truth of their contents, which is not the law.

The fault of this instruction is twofold—*first*, that it did not leave to the jury the question of the defendant's assent to the truth of the statements made in the letters, and *second*, that it permitted the jury from the mere perusal of the letters to determine whether or not their writer told the truth about the defendant.

The error is fundamental both in what the charge omitted and in what it permitted; for it omitted the defendant's assent to the truth of the contents of the letters, which was essential to their use as evidence against him; and it permitted the jury to find that the statements in the letters were true solely upon the internal evidence of the letters themselves, which was to convict the defendant by the acts and declarations of another person. That this internal evidence was of a peculiarly persuasive character does not mend matters; in

fact, it constitutes the practical injury of the instruction. For after due allowance has been made for the frantic state of mind in which the infatuated writer insisted upon the fulfillment of the promise that was to repair the consequences of her false step, no one can read these letters without a moral certainty that some such promise had been made by the defendant or tacitly permitted by him to be assumed by her.

It was in fact precisely the sort of evidence that the men who composed the jury and that all of us are accustomed to rely upon in the daily affairs of life; and it is precisely to exclude this sort of evidence from judicial investigations that the rules, that constitute the law of evidence, have been framed.

For evidence in the sense of that which induces belief or actuates conduct is a widely different thing from evidence as it is administered in courts of law, and one great service that such modern writers as Thayer, Ames and Wigmore have done is to reiterate the fact that rules of evidence are legal rules for the exclusion of evidence which but for such rules would be legal evidence. "This excluding function," says Professor Thayer, "is the characteristic one in our law of evidence." *Treatise on Evidence* 264.

In fine, evidence as a term of logical reasoning is much more inclusive than evidence as a term of judicial procedure, the relation between the two being that the initial assumption that all that is logically probative is legally admissible has been, as the result of judicial experience, subjected to a large number of exclusions, based not upon logical but upon forensic considerations, which have taken the form of rules of evidence to which in turn there are exceptions, the two together making up the law of evidence. So that the law of evidence as we have it is in the shape of a set of primary rules for the exclusion of evidence that is logically probative and a further set of exceptions to these rules. Such is the thesis of the writers referred to, the pertinence of which to the matter in hand is that, notwithstanding the logically probative character of the letters written to the defendant and their peculiarly persuasive character, they are excluded from

being legal proof of the facts stated in them by the rule of evidence that testimony to be legal must be given under oath and subject to cross-examination. To this rule of exclusion there are, of course, exceptions, such as dying declarations, matters of pedigree, deceased witnesses and the like, but none that covers the case of an unsworn statement made in writing to the person sought to be charged with its truth. The truth of a fact, however relevant or persuasively stated, must be proved by legal evidence.

The statement of the letters that the defendant had expressed a purpose to get rid of his wife by divorce was evidence of the fact that he had formed such a design and this in turn was relevant to the trial theory of the state which was that the design to get rid of his wife, which was actuated by the desire to marry another woman and had originally contemplated the obtaining of a divorce, continued down to the commission of the crime, the mode of effecting it having in the meantime changed from divorce to poison.

If the statements contained in the letters were not thus relevant we need go no further since their submission to the jury was in that case without even apparent justification. They clearly, however, were relevant and if the writer of the letters had testified as a witness in the case that the defendant had said to her that he designed to get rid of his wife by divorce and that he would soon be free to marry her it would have been competent evidence to go to the jury.

Moreover, if her testimony were, not that he had said so to her, but that she had said so to him, her testimony would be competent as a step in the proof of his acquiescence in the truth of what she had so stated to him. Such is the evidential force accorded to oral statements made to or in the presence of a party, and the crux of the present matter is the existence of an analogy between oral statements and written statements of so absolute a character that whatever is true of the one is true of the other. The existence, however, of so complete an analogy has not been accepted even by those judges who go the farthest in holding that such oral statements are always competent, and many do not go so far.

Upon one point, however, all agree, including even those text-writers who erroneously treat the matter as an exception to the hearsay rule, and that is that while the thing that is proved is the statement made to the party the thing that proves it, *i. e.*, the thing that makes it evidence, is the act of the party himself, viz., his silence. This is the key; for unless the failure of a party to reply to a written statement is the legal equivalent of the silence of a party when confronted with an oral statement there is no act of the party that makes the written statement of another evidence against him.

Upon this point there is a substantial unanimity. "Judges," says Mr. Wigmore, "have always pointed out that the failure to reply in writing to a written communication does not have the same significance as a failure to reply orally to an oral communication." *Wigm. Evid.* 1073.

The grounds of this distinction are stated in the text, the notes and the cases cited.

Then bearing in mind that, even in the case of oral declarations, the evidential factor is not that the declarant said that such and such things were true but that the party by his own act said that they were true, it is evident that, in the case of written communications, the evidential factor must be the act of the party who received the letters and not the declarations contained in the letters themselves. The question for the jury, therefore, is: Has the party by some act of his made the statements of another person evidence against him? This question was not submitted to the jury in the present case. This being so, it is immaterial whether there was testimony of such an act to go to the jury; if there was it was not submitted to them, and if there was not there was no way in which the facts stated in the letters could be used against the defendant.

The suggestion that the mere possession of written documents by the party is such an act is so clearly unsupportable that even as ingenious a writer as Mr. Wigmore can discover no ground for its support excepting that "the party may always exculpate himself and disown the inference by prov-

ing the true reason for his retention of the document," an amazing suggestion in view of the disabilities of parties to testify at common law where the rule had its origin.

The question is not *res nova* in this court. In the case of *Hand* v. *Howell*, 32 *Vroom* 142, one of the grounds upon which our Supreme Court sustained an objection to the use made of a letter written to the defendant was thus stated by Mr. Justice Collins: "It was not legal evidence. Oral declarations made to one sought to be charged thereby may in some cases be considered as admitted by silence, but the rule is otherwise as to letters. The recipient is not called on to reply or be considered as admitting what is written."

This case came upon error to this court where the judgment of the Supreme Court was unanimously affirmed for the reasons given in the opinion from which I have quoted. *Hand* v. *Howell*, 32 *Vroom* 694.

It is to be assumed that the rule thus enunciated will have accorded to it in a case involving human life the same force that was given to it in a case involving a few months' rental of a farm. The rule itself, which is in harmony with the great preponderance of decisions elsewhere, is thus stated in one of the most recent works on evidence: "Letters written to the party and received by him may under some circumstances be read against him, but before they can be received in evidence against him there must be some evidence besides mere possession showing acquiescence in their contents and proof of some act, or reply or statement." *Jones Evid.* 271.

The author cites, among other cases, *Com.* v. *Eastman*, 1 *Cush.* 189, 215, in which the Supreme Judicial Court of Massachusetts said: "The letters, however, if properly identified would not of themselves authorize any inference against the defendants; they were only the acts and declarations of others; and unless adopted and sanctioned by the defendants by some reply or statement or by some act done in pursuance of their suggestions they ought not to prejudice the defendants. Letters addressed to an individual and received by him are not to have the same effect as verbal com-

munications. Silence in the latter case may authorize the inference of an assent to the statement made but not equally so in the case of a letter received but never answered or acted upon. So far as these letters might have been shown by other proof to have been acted upon or sanctioned by the defendants so far they would have been competent evidence." This is the rule that is at once consonant with reason and with the fundamental rules of evidence as applied in English speaking courts; it accords with our own rule upon this topic and I can perceive no benefit in multiplying the citation of authorities. They are collected in *The American Digest,* tit. *"Hearsay"* (2), 1678 to 1685; in *The Decennial Edition,* tit. *"Hearsay,"* § 317 (4), and in *The Key Number Series Evidence* 318.

Most of the cases deal with the admissibility of letters, a question that we have disposed of; many of them deal with the probative effect of letters, which is conceded in the present case, if the letters were legal evidence; others deal with the efficacy of the testimony submitted to the jury to show the assent of the party, which is quite aside from the error in the present case which was that that question was not submitted to the jury, who were on the contrary permitted to treat the letters as evidence against the defendant upon their own intrinsic significance. The wrong and injury done to the defendant by such illicit evidence is manifest. He was being tried for the murder of his wife; if he had formed the design to get rid of her by poison, it greatly strengthened the conclusion that he was her murderer. The state under its claim of murder in the first degree was obliged to prove that such a design existed at the time of its deliberate execution and it undertook to prove this by showing a previous design to get rid of her by divorce, else there was no relevance in the letters. If the letters were not legal evidence for this purpose a more injurious error could hardly be imagined, for it was not without reason that the state claimed and the court repeated that "the letters were the keystone of the case that it sought to make against the defendant," since out of them the state forged (to adopt the

common figure) one of the links of a chain that is proverbially no stronger than its weakest link, and which it may be added, ceases to be a chain when a link is wrested from it by the law of evidence.

Without the evidence afforded by the letters no one can say that the jury would have found that the defendant had formed the design to get rid of his wife or that he was beyond a reasonable doubt guilty of her premeditated murder. This manifestly injurious character of the error that we have pointed out requires the reversal of the judgment of the Court of Oyer and Terminer.

SWAYZE, J. (dissenting). I cannot agree that the so-called Bunny letters were admissible to show a motive for the commission of the crime, and yet were in some way to be restricted in their use by the jury. I agree that to make them evidential against the defendant as to the facts therein stated, some action on his part must appear. My dissent is upon the ground that the evidence in the case demonstrates not only that the defendant received and retained the letters, but by his conduct, assented to the statements therein contained.

The letters cover a long period of time and constitute a regular series continued until after his arrest. He acknowledged the receipt of the last three of the series without objection to the statements therein that indicated the expectation of the writer that he would soon be free to marry her. One of the most important of the letters contains his own personal memoranda and comments. He understood and explained to a witness the enigmatical references to the relations between him and the writer; he received letters addressed to him at various points in the country where his travels took him, which could not have happened unless the writer was informed of his whereabouts.

These facts suffice to show that the letters were only one side of a mutual correspondence. In view of the frequent references of the writer to his obtaining a divorce and soon being free to marry her, the correspondence would not have

been continued as it was if he had in any way repudiated her repeated allusions to the prospective divorce and marriage. The opinion concedes that the letters were properly admitted in evidence and that "no one can read them without a moral certainty that some such promise had been made by the defendant or tacitly permitted by him to be assumed by her;" and that it was in fact "precisely the sort of evidence that the men who compose the jury and that all of us are accustomed to rely upon in the daily affairs of life."

I know of no rule of evidence that makes documents of this kind admissible and prevents the jury from drawing inferences which these quotations from the opinion show that they could not help drawing. I think that under the circumstances it is not a jury question whether the defendant by some act of his made statements of another person evidence against him. If he tacitly or expressly assented, as I think he did, the letters are evidential for the same reason that statements made in his presence by another to which he either tacitly or expressly assents, are admissible. We have held that where the court admits a confession as voluntary, it is not for the jury to decide afterwards that it was involuntary.

If the court admits declarations as dying declarations, it is not for the jury afterwards to say that they were not made under a sense of impending death. So in this case the court having decided that the letters were admissible, it was not for the jury to say whether the defendant had made the statements therein evidence against him, and the court was not bound to submit this question to the jury. No doubt the trial judge would upon a proper request have warned the jury of the care with which evidence of that character must be scrutinized, but when it is once conceded, as the court now concedes, that the letters are logically probative and legally admissible, their effect cannot be limited in any other way. I think the judgment should be affirmed.

I am authorized to say that Justices Parker, Bergen and Voorhees and Judge Vredenburgh concur in this dissent.

*For affirmance*—SWAŸZE, PARKER, BERGEN, VOORHEES, VREDENBURGH, JJ.   5.

*For reversal*—THE CHANCELLOR, GARRISON, TRENCHARD, MINTURN, KALISCH, BOGERT, VROOM, CONGDON, TREACY, JJ.   9.