27 N.J. Super. 484 (1953)
99 A.2d 595
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MICHAEL ORECCHIO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 15, 1953.
Decided September 28, 1953.
*488 Before Judges EASTWOOD, BIGELOW and JAYNE.
Mr. David H. Harris, Special Deputy Attorney-General, argued the cause for the State (Mr. Theodore D. Parsons, Attorney-General).
Mr. Albert S. Gross argued the cause for the appellant (Kapp Brothers, by Mr. Leon W. Kapp, attorney, and Mr. Herman W. Kapp, of counsel, on the brief).
The opinion of the court was delivered by BIGELOW, J.A.D.
The first count of the indictment alleges that Orecchio was Chief of County Detectives of Bergen County from March 1, 1947 to December 4, 1950. It sets forth what the pleader considered to be the duties of Orecchio as such officer, and further charges:
*489 "5. That on or about the tenth day of December, 1947, and from thence continuously to and including the fourth day of December, 1950, and on divers other dates and times, in the Borough of Fort Lee, in the said County of Bergen, there were kept and maintained at premises known and designated as 2075 Lemoine Avenue, certain gaming and betting houses wherein gambling was conducted by means of dice games, so-called; and in the said Borough of Fort Lee gaming by means of instruments, engines, apparatus and devices having figures and numbers thereon, were used and employed and conducted; and in the said Borough of Fort Lee furniture and implements used for the playing of unlawful games were kept, stored and possessed, all in violation of the laws of this State, and all of which he, the said Michael Orecchio, public officer as aforesaid, then and there well knew.
6. That, nevertheless, the said Michael Orecchio, being such public officer aforesaid, and well knowing the premises aforesaid, * * * unlawfully and wilfully did neglect, fail and omit to use and exercise, and cause to be used and exercised, all proper, reasonable, effective and diligent means and all lawful means within his power as Chief of the County Detectives of the Bergen County Prosecutor's Office, for the detection, apprehension, arrest and conviction of a person or persons who kept and maintained the gaming house as aforesaid, wherein the practice of maintaining a resort to which persons might come for an illegal purpose, namely, for the purpose of playing at dice; and wherein the laws of this State concerning gambling were violated in the manner and form aforesaid, but, on the contrary, then and there unlawfully did suffer and permit gambling in the manner and form aforesaid."
The two other counts on which the defendant was convicted are to the same effect, but one of them names a gambling establishment known as Costa's Barn in the Borough of Lodi, and the other mentions premises known as 1010 Palisade Avenue in Fort Lee.
With regard to the expression "unlawfully and wilfully:" The word "unlawfully" negatives all legal cause of excuse. Bishop, Criminal Procedure (1913), § 503. "Wilful" is opposed to accidental or involuntary; it means intentional; what a man wills to do. State v. Clark, 29 N.J.L. 96 (Sup. Ct. 1860); State v. Scott, 104 N.J.L. 544 (E. & A. 1928). "`It is frequently understood * * * as signifying an evil intent without justifiable excuse.'" Potter v. U.S., 155 U.S. 438, 15 S.Ct. 144, 147, 39 L.Ed. 214 (1894). In the indictment before us, the expression "unlawfully and wilfully" should be construed to mean *490 intentionally and without legal excuse. But these adverbs do not aid the indictment if the defendant was not under a legal duty to do the acts which he is charged with omitting. The statement in the indictment of Orecchio's duty is a mere conclusion of law, without effect when the sufficiency of the indictment is the subject of inquiry.
The office or position of county detective was created by the criminal procedure revision, L. 1898, c. 237, § 158, p. 921, R.S. 2:181-10, which authorized the prosecutor of the pleas to appoint suitable persons "to act as special officers for the detection, arrest, indictment and conviction of offenders against the law. The persons so appointed shall possess all the powers and rights and be subject to all the obligations of constables and police officers in any county of this state, in criminal matters only." R.S. 2:181-10. The same section empowered the prosecutor to designate one of such special officers as chief of county detectives, but it does not indicate in any way his duties or powers.
The Attorney-General advances the theory that the phrase "for the detection, arrest, indictment and conviction of offenders against the law" imposes certain express duties on the special officers or county detectives, as they are usually called, and on Orecchio as their chief. We think that view is erroneous. There can be no duty to perform an act or accomplish a result unless there is bestowed a corresponding power. These officers cannot control what matters the grand jury shall take up for action; they cannot testify before that body unless summoned; they cannot move an indictment for trial, decide whom the State shall summon as witnesses, or participate in the trial in any way. They have no special authority to make arrests and their power to detect criminals is limited by their native ability and by their training.
Ever since 1874, the prosecutors of the pleas have been under a statutory duty "to use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." Rev. 1877, p. 286; R.S. 2:182-5. The use of the same words in the statute authorizing the appointment of special officers, shows the legislative *491 intent that they should aid the prosecutor in the performance of his duty in these respects. An implied authority is given the prosecutor to make rules for the guidance of the county detectives, including the chief of the county detectives, to divide responsibility among them, and to allocate particular tasks to each. And undoubtedly the defendant and the other detectives were obligated to conform to the prosecutor's reasonable regulations and directions of the kind suggested. State v. Hageman, 13 N.J.L. 314 (Sup. Ct. 1833). But the indictment does not allege such action by the prosecutor, and does not charge Orecchio with disobedience to any regulation or order of the prosecutor.
The statutory authority and duties of the county detectives are stated in the sentence of R.S. 2:181-10 which reads:
"The persons so appointed shall possess all the powers and rights and be subject to all the obligations of constables and police officers in any county of this State, in criminal matters only."
There is no statute to which our attention is directed conferring powers or imposing obligations on constables or police officers which are relevant to the case before us. The common law duties of constables were stated in general terms, without reference to any nonfeasance, in Hartley v. Inhabitants of Granville, 216 Mass. 38, 102 N.E. 942, 943, 48 L.R.A.N.S. 392 (Mass. Sup. Jud. Ct. 1913):
"The general duties of such an officer are to be vigilant to preserve the peace, to prevent the commission of crime, and to arrest all offenders in his town who might be arrested without warrant, and to procure warrants in other instances of crime committed. The quaint description of his duties given in early definitions is `to keep the king's peace.' To keep the peace in its broad sense means to quell riots and disturbances of every nature, to prevent the commission of crime, and to see that offenders in their several districts are arrested and prosecuted."
The duties of police officers and constables are discussed in 62 C.J.S., Municipal Corporations, § 575 and 80 C.J.S., Sheriffs and Constables, § 42(b).
*492 In State v. Donovan, 132 N.J.L. 319 (Sup. Ct. 1945), it is said:
"One of the fundamental duties of a police department, from chief of police to patrolman, is to be on the lookout for infractions of the law and to use due diligence in discovering and reporting them, and in a proper case arresting the perpetrator and lodging and prosecuting a proper complaint."
Reasonable discretion must be left to police officers and only when they exceed that discretion, do they depart from their duty. People v. Calpern, 259 N.Y. 279, 181 N.E. 572, 83 A.L.R. 785 (N.Y. Ct. App. 1932). We do not mean discretion whether or no the law should be enforced but discretion as to the steps to be taken toward that end. We have already noted that the statute does not indicate the powers or duties of the chief of county detectives. He is himself one of the detectives, enjoying the same authority and burdened with the same obligations as the others. In addition, we think it fair to imply from his title some degree of authority over his fellows. Indeed, the indictment avers that Orecchio, as chief, "had under his direction, management and control, detectives and investigators." With his added authority, there should also be inferred a broader discretion.
The indictment alleges that "there were kept and maintained at premises known and designated as 2075 Lemoine Avenue, certain gaming and betting houses wherein gambling was conducted by means of dice games, so-called; * * * all of which he, the said Michael Orecchio, public officer as aforesaid, then and there well knew." What was his duty in that situation?
He was obligated in good faith to take such lawful action as in his discretion seemed likely to be effective, in order to close the gambling houses and bring the criminals to justice. Good faith and reasonable diligence were required of him, but just what should he do? He might turn over his information to the Fort Lee police or to one of the county detectives, or he might report the situation to the prosecutor and ask for instructions. He might even try *493 to obtain evidence himself on which he could base a complaint. Doubtless there were many other courses of action open to him. He was under no duty to pursue them all, but only such as, in his honest judgment, he thought were suitable to the situation. But if intentionally (willfully) and without legal excuse (unlawfully) he refrained from taking such action as he himself thought the situation demanded, he was criminally liable.
The charge of nonfeasance contained in the indictment is that Orecchio omitted to use "all proper, reasonable, effective and diligent means and all lawful means within his power." Our Supreme Court, in State v. Winne, 12 N.J. 152 (1953), reviewing an indictment employing the same phraseology, held that it charged the accused with doing nothing at all. So the indictment clearly charges a crime; the defendant's attack on it was properly overruled.
But there are other matters requiring consideration.
A few days before the day set for the trial, March 3, 1952, the defendant moved that the trial be postponed so as to allow a reasonable time "for the public excitement to subside and the community to become tranquilized." Three happenings in particular stirred the defendant to make his unusual motion.
On or about January 31, 1952, there was erected and had since been maintained, within 100 feet of the Court House and visible from the rooms to which trial juries ordinarily retire for their deliberations, a large display advertisement, 12 feet by 38 feet, bearing the legend:

"RID BERGEN COUNTY OF CRIME AND CORRUPTION!

The Shame is Ours!
THE INDICTMENTS:
`Law enforcement in Bergen County was a sorry spectacle'
  United States Senator Estes Kefauver
`Bergen County was A Province of the Underworld Protected by Corrupt Public Officials'
  Deputy Attorney-General Nelson F. Stamler
This advertisment paid for by the New Jersey Crime Prevention Council, Inc. Bergen County Chapter"
*494 A week later, February 7, the grand jury of Bergen County brought into court a presentment which was immediately made public. It dealt with gambling and contained this passage:
"This bookmaking racket could not have existed without the active cooperation of officialdom at all levels. That it did exist for so long a period indicates that this protection had been forth-coming. Public officials and police in municipalities, small and large, were corrupted. Some of these officials and police may never have taken a penny of this easy money, yet, by their failure to act, they could only be considered active participants in a gigantic conspiracy to sneer at our laws."
On February 20 the Deputy Attorney-General, who had charge of the prosecution of Orecchio, participated in a television broadcast, visible and audible throughout Bergen County, in which the "widespread and syndicated gambling" in that county was discussed and the failure of public officials to stop it.
There was a further showing of much newspaper publicity and general excitement. The motion for a continuance was denied, although, as it happened, the trial was not begun until March 9, 1952, one week after the scheduled date.
The motion for a continuance was, of course, addressed to the discretion of the court. Schuttler v. Reinhardt, 17 N.J. Super. 480 (App. Div. 1952); Allegro v. Afton Village Corp., 9 N.J. 156 (1952). While the defendant made a strong case for his motion, we are not satisfied that the judge who heard the motion was mistaken in denying it. The offending display sign was taken down before the jury was impanelled. The trial could not well be postponed until the strong public feeling should disappear  it still continues after a year and a half, although probably not as sharp as it was. Perhaps a change of venue would have been wise, but it was not requested. However, the situation clearly required counsel for the State, as well as the trial court, to avoid adding to any prejudice against the defendant that might interfere with a fair trial.
*495 The other rulings of which the defendant complains and which we must consider, all relate to the admission of evidence.
In the prosecutor's suite in the Bergen County Court House was an office which Orecchio "occupied"  as the witnesses put it. In it were two filing cabinets of three drawers each and Orecchio's desk, besides chairs and a table. On December 1, 1950 an investigator employed by the Attorney-General seized all the papers in the office. The State was unable to show whether any particular paper was found in the cabinets or the desk or in the table drawers. Several hundred of the papers so seized were put in evidence over defendant's objection and were marked either singly or a dozen or so papers as one exhibit. The position of the State appears from this colloquy:
"The Court: It is your thought that everything that was in that office is binding upon this defendant?
Mr. Harris: For whatever value this jury wants to ascribe to it. I think it is admissible because it was found in his office."
The court admitted the papers in evidence without limitation, so that they became evidence of the facts contained therein as well as proof of defendant's knowledge of the sundry crimes mentioned in the papers. Two examples of these papers must suffice. Exhibit S-12 is a letter dated December 10, 1947, written by the chief inspector of the New York Police Department to the Prosecutor of Bergen County:
"We have information that an alleged dice game is being operated by one Joseph Adonis, Frank Costello, Willie Moore, Holly Moore, Tony Green and Dick Wallace, at the Automatic Conveyor Plant, 284 Gorge Road, Cliffside, N.J. and the Club Bali, and Aristocratic Carriage Company, Fort Lee, N.J. This information is forwarded for whatever action you deem appropriate."
Exhibit S-58 is an anonymous letter, addressed to the Prosecutor and dated June 26, 1944. It reads:
"You stated in the papers that you would investigate any tips that may lead to gambling in Bergen County. If you are sincere then you should begin in Fort Lee, where gambling is being run *496 wide open. Bookmakers under protection along with their stooges are doing a land office open business. The old gambling barn near Geo. Washington Bridge on Cross St is occupied by Bookies. They seem to have an abundance of telephones. They are strung into the barn from surrounding homes nearby. This is the place where a wide open Wire Service Bookmaking establishment was run for years until it was moved to the New Barn across on the other side of the Bridge."
The Attorney-General argues that even if these papers were erroneously received in evidence, the error was harmless since Orecchio does not show that they bore directly on the charges of nonfeasance contained in the three counts on which he was convicted. We are not satisfied with this theory. The jury may well have believed that the "old gambling barn" mentioned in S-58, was Costa's Barn named in the second count, and that the Aristocrat Baby Carriage Factory mentioned in S-11 is the same premises as 2075 Lemoine Avenue, or 1010 Palisade Avenue, named in the first and third counts. But more important, the weight of this mass of papers relating to gambling must have influenced the jury to believe more readily that gambling houses were unlawfully maintained as charged in the first three counts and that Orecchio was cognizant of their existence.
The State relies upon the rule that articles found in a defendant's possession which indicate motive, or preparation, or commission of the crime, or throw light upon the crime or connect accused with it, are admissible. Articles have been considered to be in defendant's possession whether taken from his person, or found, right after his arrest, in the rooms where he lived, or in the premises where he conducted a small retail shop. State v. Hill, 65 N.J.L. 626 (E. & A. 1900); State v. Laster, 71 N.J.L. 586 (E. & A. 1905); State v. Morehous, 97 N.J.L. 285 (E. & A. 1922); State v. Sage, 99 N.J.L. 229 (E. & A. 1923). Within this rule it has been held that letters in the possession of the defendant and addressed to him, are admissible to show motive or notice. State v. MacFarland, 83 N.J.L. 474 (E. & A. 1912); State v. Martinek, 12 N.J. Super. 320 (App. Div. 1951); Wigmore, Evidence, § 260.
*497 Most people read letters addressed to them rather promptly upon receipt thereof, and so it is generally a reasonable inference that letters addressed to a defendant and found in his possession have been read by him, and that he has acquired knowledge of their contents. But if the circumstances are such that the inference cannot be fairly drawn that defendant has read the letters, they are not admissible in evidence, even to prove notice.
The State's evidence presented before the papers were received in evidence showed that, besides Orecchio, two other county detectives had keys to the office where the papers were found; that the door to the office was customarily wide open during the hours when the prosecutor's office  that is, the suite as a whole  was open for business. The filing cases which contained many  probably most  of the papers in question, were put in Orecchio's office in 1949, and many papers that had been kept in another office were then moved to these cases for mere convenience of storage. The letters which were put in evidence were not addressed to Orecchio. There was no reason for assuming that he had ever read the papers in these cases, or that he was familiar with their contents. They did not tend to prove notice to him.
As already pointed out, the State contended that the papers were "binding upon this defendant," and the court admitted them generally and not for a limited purpose. State v. MacFarland, supra, expressly holds that such papers are not evidence of the truth of their contents. Even were the papers lawful evidence of notice, their admission without limitation was clearly harmful error.
The State offered and the learned trial judge admitted, ever the defendant's objection, 56 indictments for gambling returned by the Bergen County grand jury. Orecchio was not named in any of these indictments; they named as defendants a score of other persons. They were all returned by the grand jury after Orecchio had been indicted. The Attorney-General presents the astounding proposition that "the indictments are evidential to indicate the persons named in the indictments were transgressors of the law during the *498 times charged in defendant's indictment." Also, as proof that had defendant been diligent, he could have obtained evidence against the persons named in the 56 indictments.
An indictment is a mere accusation; it is not evidence of guilt of the defendant named therein; it does not even weaken the presumption that he is innocent. As to the suggestion that an indictment found, let us say, in May 1951, is proof that Orecchio, prior to December 1950, could have obtained evidence of the offense charged in the indictment  the non sequitur is obvious. The reception of the indictments was error.
Another remarkable occurrence at the trial was the admission of the Erickson inventory, so-called. On May 2, 1950 police in New York raided the office of a man named Erickson and found there a great many business records and papers, some of them referring to alleged gambling in Bergen County. The police hurriedly made a descriptive list or inventory of the papers and had it mimeographed. Mr. Stamler, a Deputy Attorney-General of New Jersey, charged with the investigation of gambling, obtained a copy from the New York police  "probably in May of 1950. I don't think it was much after the events occurred." Orecchio seems never to have seen a copy of the inventory. The Stamler copy was offered by the State at the trial and was received in evidence.
The State argues that had Orecchio been "on his toes" he would have read in some newspaper of the raid; would have guessed that the raiders had obtained information that would assist him in detecting crimes in Bergen County; would have inquired of the New York police, and obtained a copy of the inventory. And, ergo, the inventory was material to the question of Orecchio's guilt. This line of argument is much too conjectural. The court erred in admitting the document.
One more example of the tactics used by the Attorney-General to obtain a conviction will be enough. The State called two detectives, Guidetti and Allyn, to testify to the criminal records of certain individuals. The testimony was *499 not produced to affect credibility, but to prove "the business, occupation or pursuit of such individuals * * * to identify them and their habits."
Guidetti was asked, "Did you acquire any information with reference to their police records?" After objection was overruled, he replied: "I know the records of some of them."
"And what do you know about the police record of Sammy Adamo?" Again objection was interposed and the question allowed. The witness answered:
"If I am correct, he was convicted in New York, in Kings County I think, for statutory rape and sent to Elmira Reformatory.
Mr. Kapp: I object to all this. The purpose of this interrogation is to inflame this jury and to prejudice this jury against the defendant. This testimony can have absolutely no bearing on the guilt or innocence of this defendant as far as this indictment is concerned.
The Court: I will allow it."
And so on. "I remember that he was sent to Danbury, Connecticut, for a year." "I think for counterfeiting stamps." "Lombardi has been convicted I believe on two or three occasions as a still man . * * * A professional bootlegger." "I believe he was arrested in 1949 for bookmaking." Neither Adamo nor any of the others mentioned in the testimony was a witness at the Orecchio trial.
We do not comprehend how it was material whether or no Adamo had been guilty of statutory rape in New York in 1911, or whether he had counterfeited stamps; or whether Lombardi had been a bootlegger or engaged in the practice of bookmaking. But assuming materiality, obviously the detective's evidence was incompetent to prove the facts. If the fact of a conviction was material, the best and only competent proof was the original record or an exemplified copy thereof. The comment of Mr. Kapp quoted above was fully justified.
Questions on the law of evidence involved in the trial of Orecchio do not seem to have been difficult. Take the first count, for example. The State had the burden of proving beyond a reasonable doubt the keeping of a disorderly *500 house at 2075 Lemoine Avenue, Fort Lee. The same quality of evidence was required as if the keeper of the gambling establishment were on trial  except that his confession would not have been evidential as against Orecchio. The State must rely on eye-witnesses. Then the State had to prove notice to Orecchio  not proof that he was aware of the existence of crime or gambling in general, for that fact would be immaterial  but proof of notice of the keeping of a gambling house at 2075 Lemoine Avenue. And lastly, the State had to show that Orecchio, with such knowledge, did nothing. A negative is always hard to prove; but perhaps evidence by the Fort Lee police and Orecchio's associates in the prosecutor's office  or his own admissions  would have been enough to justify an inference that he did nothing.
The conviction must, of course, be reversed.
JAYNE, J.A.D. (concurring in reversal).
Judge EASTWOOD and I are in accord with the conclusion that the judgment of conviction should be reversed for reasons incorporated in the opinion of Judge BIGELOW, but we do not acquiesce in several of the inferences or implications that we apprehend might be derived from the phraseology of his opinion.
In particular we do not agree that the statutory phrase "for the detection, arrest, indictment and conviction of offenders against the law" imposes no duties on the duly appointed county detectives or that they cannot testify before the grand jury unless summoned, or that they have no authority to make arrests. Vide, R.S. 2:181-10; N.J.S. 2A:157-2; State v. Donovan, 132 N.J.L. 319 (Sup. Ct. 1945); Hartley v. Inhabitants of Granville, 216 Mass. 38, 102 N.E. 942, 48 L.R.A., N.S. 392 (Mass. Sup. Jud. Ct. 1913), cited in Judge BIGELOW'S opinion.
Another passage of the opinion expresses the reflection of the author that perhaps a change of venue, if requested, would have been wise. We conceive it to be unnecessary to forecast our contemplations, if any, upon that extraneous subject. Nihil habet forum ex scena.
*501 Moreover we do not assent to the postulate that in establishing the guilt of the keeper of a gambling house the State "must rely on eye-witnesses."
Lastly, we advert to the characterization of the presentation of the State's case as an exemplification "of the tactics used by the Attorney-General to obtain a conviction * * *" The comment is undoubtedly intended to relate to the conduct of the Special Deputy Attorney-General who represented the State at the trial. The derivative implications might in their expansion encompass unwarranted suppositions which we are not justified in entertaining.
In substitution we would have preferred to repeat with emphasis the Canon of Ethics: "The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done," and invite our prosecuting attorneys to read the admonitory statements of the courts in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935); State v. Bogen, 13 N.J. 137 (1953); State v. Vaszorich, 13 N.J. 99 (1953).