**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Maurice KIRKSEY,
Defendant-Appellant.**

No. 49594.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 27, 1987.

Motion for Rehearing and/or Transfer
Denied March 4, 1987.

---

Allen I. Harris, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Lee A. Bovine, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SATZ, Judge.

Defendant Maurice Kirksey was convicted by a jury of robbery in the first degree, § 569.020 RSMo.1979, and armed criminal action § 571.015, RSMo.1979. He was sentenced to life imprisonment and a consecutive sentence of 15 years. Defendant appeals. We affirm.

One morning in June, 1984, Frank Guerra, a bank courier, drove his car into a Sunoco station and parked in front of the station attendant's window. As a bank courier, Guerra deposited cash receipts in banks for various service stations. Guerra got out of his car, was given several bags of cash receipts by the station attendant, William Waghorn, and then Guerra locked the bags in the trunk of his car. As Guerra started back toward the driver's side of his car, three men attacked him. One man grabbed Guerra by the throat. A second held a pistol at Guerra's head, while the third took Guerra's gun and pointed it at Waghorn. The men then took Guerra's car keys, opened the trunk, grabbed the bags of money and escaped in a green Chevrolet.

Elijah Johnston noticed the green Chevrolet "burn rubber" as it left the Sunoco lot. Johnston gave police the Chevrolet's license plate number. The police traced the vehicle to a Palm Avenue address and sent out an all points bulletin. A Sergeant Brown heard the bulletin and proceeded to the Palm Avenue address, a multi-family apartment house. After arriving there, Brown noticed defendant standing in a doorway, behind an iron gate. Apparently, defendant saw Brown and slammed the door shut. Brown radioed for assistance, then knocked on the door, and defendant's girlfriend, Shirley Woods, answered. Woods told Brown she did not have a key to the gate and told him to try to enter through the back.

Officer Braxton arrived shortly after Brown and went to the rear of the building. Braxton was accompanied by several other officers who had just arrived. The officers used wire cutters to cut a lock off the back gate and then entered the apartment. When they did not find the defendant in Wood's apartment, the officers searched the rest of the building.

In the basement, they found some weapons, including a service revolver Guerra identified as his. Defendant and the Sunoco money were found in Lorraine Ford's apartment, located above Shirley Woods' apartment. Defendant was found in Ford's bedroom, lying on the bed with a towel over his head. These officers arrested defendant. Meanwhile, other officers not involved in the search, found the green Chevrolet observed by Elijah Johnston parked nearby.

Subsequently, defendant was placed in a lineup. At the lineup, both Waghorn and Guerra thought defendant looked familiar, but they could not make a positive identification. A palm print found on the trunk lid of Guerra's car, however, was identified as defendant's print. In addition, three of the money envelopes found in the money bags were marked with defendant's fingerprints.

Defendant testified at trial. He said he was in Lorraine Ford's apartment because she had asked him to fix her stove. According to defendant, about twenty-five minutes after he arrived, someone knocked on Ford's door. It was a man with a bag. The man dropped the bag, and money and envelopes spilled out. He then ordered Ford and defendant to put the spilled money back into the bag. They complied. Ford refused to let the man in her apartment and closed the door leaving him in the hallway. Defendant identified the man as "Mannix", whom defendant had seen around the neighborhood. Defendant said he was merely resting when police later arrested him.

Defendant also called a neighbor, Reverend Thomas, as a witness. The Reverend said three youths knocked on his door,

holding money satchels, but defendant was not one of these three.

In rebuttal, the state called Ford as a witness. She said defendant came to her apartment asking for water. He was carrying a bank bag. No other person came to her apartment that morning.

Defendant first contends the state failed to make a submissible case. We disagree.

To resolve the issue of submissibility, we view the evidence and inferences in the light most favorable to the verdict and disregard all contrary evidence and contrary inferences. *E.g., State v. Overkamp,* 646 S.W.2d 733, 736 (Mo.1983). We do not weigh the evidence but determine whether the evidence was sufficient for reasonable persons to have found defendant guilty as charged. *E.g., State v. Porter,* 640 S.W.2d 125, 126 (Mo.1982). In making this determination, we must consider whether any reasonable hypothesis of innocence exists. *E.g., State v. Goddard,* 649 S.W.2d 882, 884 (Mo. banc 1983).

■ Without again detailing the facts, the police traced defendant through an automobile license. The automobile, the stolen money and the robbery weapons were all found in the same vicinity as defendant. Defendant matched the general description of one of the robbers, his fingerprints were on the money envelopes and his palm print was on the courier's vehicle. These facts alone make a submissible case on robbery, first degree.

Defendant does not offer a reasonable theory of his innocence. Instead, he attacks the state's evidence. First, he contends the state's eyewitnesses, Waghorn and Guerra, could not identify him. Literally, this is true. However, the state is not required to prove its case by direct evidence, particularly identification by eyewitnesses. *See, e.g., State v. Worley,* 353 S.W.2d 589, 594 (Mo.1962). Moreover, Guerra and Waghorn did say defendant looked familiar, and Guerra only minimally qualified his identification by saying he was not "positive." Contrary to defendant's contentions, this testimony of Guerra and Waghorn strengthens rather than weakens the state's already submissible case.

Defendant also contends the evidence of his fingerprints on the money envelopes is irrelevant, and, thus, inadmissible. This evidence was irrelevant, defendant contends, because none of the "loot" was in the envelopes. This argument is misdirected and, thus, misses the mark.

■ "[Evidence] is relevant if it ... tends to prove a fact in issue", *State v. Mercer,* 618 S.W.2d 1, 9 (Mo. banc 1981), *cert. denied* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981), and evidence tends to prove a fact in issue if it makes the existence of the fact more probable than it would be without such evidence. *Id.* Defendant's fingerprints were on money envelopes found inside the stolen money bags. This fact tends to prove defendant handled the stolen property and, thus, tends to show defendant's guilt. To make a submissible case, there was no need for the state to show defendant was found with the bag in his hand or his hand in the bag.

Defendant next contends the submission of both robbery in the first degree and armed criminal action constituted double jeopardy, in violation of the Fifth Amendment of the United States Constitution and Article I, § 19 of the Missouri Constitution. More specifically, defendant argues that § 569.020 RSMo.1979, defining robbery, first degree, "creates an enhancement for the use of a weapon, and, therefore, a second enhancement statute [§ 571.015 RSMo.1979, armed criminal action] for the same weapon is constitutionally infirm." We disagree.

■ Defendant's argument has previously been confronted and laid to rest. *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535, (1983). When the state legislature defines a crime and its punishment, the Double Jeopardy Clause, applicable to the states through the Fourteenth Amendment, prevents the imposition of a punishment greater than the state legislature intended. *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983); *State v. Harvey,* 648

S.W.2d 87, 90 (Mo. banc 1983); *State v. Van Doren*, 657 S.W.2d 708, 714–15 (Mo. App.1983). The Double Jeopardy Clause, standing alone, does not preclude cumulative punishments for acts committed on a single victim or in a single transaction. *See State v. Van Doren*, 657 S.W.2d at 715. If the legislature specifically authorized the penalties, the punishments are not improperly cumulative. *Missouri v. Hunter*, 459 U.S. at 368–69, 103 S.Ct. at 679. *See also* Thomas, *Multiple Punishments for the Same Offense: The Analysis After Missouri v. Hunter or Don Quixote, the Sargasso Sea, and the Gordian Knot*, 62 Wash.U.L.Q. 79, 110–11 (1984). On the present facts, our state legislature specifically authorizes cumulative punishment under two statutes, § 569.020, RSMo.1979 and § 571.015, RSMo.1979. Thus, quite properly, the prosecutor sought and the jury imposed cumulative punishments. *E.g. Missouri v. Hunter, supra.*

Defendant also contends all the "in-court identifications" were tainted by unduly suggestive circumstances, namely, that defendant was the "only black individual" at the counsel table when he was "identified". Defendant's argument is misdirected and, thus, misses the mark.

Five of the state's witnesses pointed out defendant in the courtroom. Three of these were police officers who took part in arresting defendant. Over defense counsel's objections, each officer pointed out defendant in the courtroom as the person who had been arrested. This is not the testimony of an eyewitness identifying a defendant as the perpetrator of a crime. That kind of testimony is identification testimony and, understandably, is closely scrutinized. *See, e.g., Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Higgins*, 592 S.W.2d 151, 159 (Mo. banc 1979).

■ The other two witnesses, Guerra and Waghorn, did not identify defendant as the culprit. Each of them pointed to defendant in the courtroom and simply said he was the man who "looked familiar" to them during the lineup conducted prior to trial. Their failure to identify defendant does not show any suggestive influence. It shows they were unable to identify defendant at the lineup. Their failure to make positive identification would simply be used by the jury in assessing their credibility. *See, State v McKinney*, 498 S.W.2d 768, 770 (Mo.1973), *cert. denied*, 415 U.S. 926, 94 S.Ct. 1433, 39 L.Ed.2d 483 (1974).

Defendant also complains the trial court admitted testimony of two officers which was prejudicial hearsay. Officer Brown testified that, while he was at the front door of the apartment house, Shirley told him: "I don't have the key", "go around to [the] back." Officer Kelly, the state's sponsoring witness of a "consent to search form", testified Shirley Woods had signed the form.

Defendant's contention and supporting argument are neither clear nor explicit. We have set out in the margin defendant's entire "Point" and "Argument".[1] Defendant's "Point" does not specifically state why the trial court erred, and his "Argument" provides no additional explanation. Defendant's "Point" and "Argument" are, thus, procedurally defective, Rule 30.06(d), and we are not obligated to search the record to establish defendant's point and make his argument for him. *State v. Casey*, 683 S.W.2d 282, 285 (Mo.App.1984); *State v. Lupo*, 676 S.W.2d 30, 33 (Mo.App. 1984).

■ Moreover, Woods' statement to Officer Brown—"I don't have the key", "go around the back"-apparently was elicited to explain Brown's subsequent action and, thus, was not hearsay. *State v. Ashley*, 616 S.W.2d 556, 561 (Mo.App.1981); *State*

---

1. "VII THE COURT ERRED IN ALLOWING IN PREJUDICIAL HEARSAY.

 The Court allowed the statements made by Shirley Woods (now Kirksey) as to the fact that she stated she did not have the keys and directed police to the rear entrance, and further that she signed Consent to Search forms.

Admission of improper hearsay is the ground for mistrial. (Cases cited.)

 Therefore, for the reasons stated herein, the Court should reverse and remand."

*v. Houston,* 607 S.W.2d 183, 185 (Mo.App. 1980) Admittedly, Kelly's identification of Woods' signature on the "consent form" may or may not be hearsay depending upon the purpose for which the form was introduced. There is nothing in the record to indicate for what purpose the signed form was being introduced.

Defendant also attacks a remark made by the trial court during closing argument as an improper comment on the evidence. During trial, the state's evidence showed defendant's palm prints were on the trunk of Guerra's car and the car had been "cleaned" the night before the robbery. In closing argument, the prosecutor stated the "robbers handled" the trunk lid and noted: "[t]he car was washed". Defense counsel objected, arguing the evidence showed the car was "cleaned" rather than "washed". In overruling the objection, the court said "[t]he evidence is [:] it was washed the day before". On appeal, defendant contends "cleaned" may mean vacuuming the interior, whereas "washed" may include the use of soap and water on the exterior. Defendant claims that prints on the exterior would have been removed had the car been "washed"; not so, had the car simply been "cleaned". Apparently, defendant contends "washing" of the car serves the state's purpose because washing would have cleaned all the prints from the car and, thus, the jury would be misled into believing that defendant's prints must have been made sometime after the car was washed.

This argument borders on the frivolous. Defendant would have us believe there are precise, mutually exclusive definitions, in common parlance, between "cleaned" and "washed". "Washing", however, necessarily includes "cleaning", unless the "washing" is improperly done; and, certainly, "cleaning" can include "washing".

■ Even if we accept defendant's definitions of "cleaned" and "washed", the comments of the trial court would not prejudice defendant. If the car were simply cleaned on the inside, defendant would still have to explain the fact that his palm print was on the trunk of the car. Defendant

does not argue or intimate the palm print was not his. Therefore, the inference would be the palm print was put on the trunk sometime before or after the robbery. Thus, the palm print itself would still be relevant. Arguably, it would be less probative, but not so much less that its admission into evidence would work a prejudice against the defendant.

Certainly, the court must make no comment which could prejudice defendant. *E.g. State v. Lomack,* 570 S.W.2d 711, 712 (Mo.App.1978). However, in context, the court's possible error in choice of words of comparable meaning is innocuous, and, contrary to defendant's argument, the choice is a far cry from a prejudicial comment on the evidence.

Defendant next argues the jury should have been allowed to compare defendant's palm print with the palm print taken from the trunk of Guerra's car. During trial, the two prints were passed to the jury. Then, during its deliberation, the jury requested the two prints. The trial court refused the request because, the court said, comparison of the prints was the subject of expert testimony and, thus, the jury was not competent to make such a comparison.

■ The decision whether to allow the jury to view exhibits during its deliberation is a matter of discretion for the trial court. *State v. Williams,* 643 S.W.2d 3, 4 (Mo. App.1982). Although the admission of the palm print exhibits depended upon an explanation by an expert, this fact would not prevent the jury from viewing the exhibits during its deliberations. *See State v. Stewart,* 615 S.W.2d 600, 606 (Mo.App.1981). However, the jury had no absolute right to view the exhibits. *Id.*

■ Admittedly, the trial court here mistakenly believed the jury could not view the exhibits because they were the subject of expert testimony. This, however, did not prejudice defendant. The jury was allowed to compare the prints during trial, and defendant had the opportunity to expose the weaknesses in the expert's opinion through cross-examination. Thus, on the present facts, the trial court's ruling was well with-

in its discretion. We do not reverse a correct evidentiary ruling simply because it may have been based upon an incorrect reason. *See e.g., Roach v. Consolidated Forwarding Co.,* 665 S.W.2d 675, 682 (Mo. App.1984).

Defendant also argues the trial court erred in failing to strike venireman Ray for cause. During voir dire, Ray stated he had formed an opinion about the case. According to defendant, Ray indicated he would have to be dissuaded by additional information before he would change his opinion. By this indication, defendant contends, Ray, in effect, was stating he would not consider the evidence with an open mind. Defendant misreads the record.

The rules for reviewing a trial court's denial of a challenge for cause are well known:

> [The trial court has] wide discretion in determining the qualifications of a prospective juror and its ruling will be disturbed on appeal only when clearly against the evidence and it constitutes an abuse of discretion.... Each case must be judged on its facts and the relevant voir dire must be considered in its entirety.... Absence of an independent examination by the trial court justifies a more searching review by an appellate court of the challenged juror's qualifications. *State v. Johnson,* [722 S.W.2d 62] (Mo.1986).

We have set out the pertinent voir dire examination of Ray in the Appendix. From it, it is clear Ray did form an opinion about the case from "gossiping" with his neighbors. When asked by the prosecutor whether he could "set aside [his] opinion and judge this case on the testimony and evidence heard in the courtroom and not ..., what [he] heard outside the courtroom", he answered: "Yes." Then when asked by defense counsel, "Are you saying that one of us is going to have to make you

change your opinion", he answered: "Yes." Finally, when asked by the court whether he believed he could put his opinion aside and "be guided solely by the evidence [he would hear] from the witness stand" and by the instructions, he answered: "Yes, Sir." Reading this, Ray appears to be equivocal and unsure of his ability to set aside his opinion. Taken in total context, however, his apparent equivocation fades and disappears.

■ Defense counsel's question about Ray's ability to set aside his opinion came immediately after an unrelated question Ray clearly could not understand. (See Appendix.) This could have unsettled Ray in his attempt to understand defense counsel's question about his ability to set aside his opinion. More important, the difference between setting aside your opinion on your own, without additional information, and requiring another to make you change your opinion with additional information may be a distinct, crystal clear difference to the trained legal mind. This difference, however, which borders on the metaphysical, is not, we believe, that clear to the lay person. To us, Ray simply was attempting to be consistent in his answers. This becomes even more apparent where the trial court, properly fulfilling its obligation to ascertain impartiality, went the extra mile and re-determined whether Ray really thought he could set aside his opinion and consider the evidence with an open mind.

We are not unmindful of the understandable concern and, perhaps, consternation of our Supreme Court on this issue. However, here, the trial court's independent examination of Ray removed any doubts about Ray's ability to set aside his opinion and to act as a fair and impartial juror. *See, e.g., State v. Pennington,* 642 S.W.2d 646, 649 (Mo.1982) Thus, the trial court's denial of defendant's challenge for cause was within its discretion.[2]

---

**2.** This issue of selecting unbiased jurors is perennial and, perhaps, will be with us until a new process for selecting impartial jurors is created. Understandably concerned about the continued existence of this issue, the Supreme Court has suggested a method for avoiding its creation by admonishing the trial courts to err on the side

of caution in determining whether a prospective juror should be excluded. *See, e.g. State v. Hopkins,* 687 S.W.2d 188, 190 (Mo. banc 1985); *Id.,* at 191, concurring opinion, Blackmar, S., J.; *State v. Johnson,* 722 S.W.2d 62 (Mo. banc 1986), Welliver, J. dissenting.

Finally, defendant contends the prosecutor improperly argued that Lorraine Ford, the state's rebuttal witness, had been intimidated by defendant. During direct examination, Ford said she was nervous. In addition, she said defendant's counsel had interviewed her, in the presence of defendant, before trial. Then, during her cross-examination, she apparently began crying and acknowledged she had previously told defense counsel she did not "want to get involved."

With this evidence on the record and no more, the prosecutor in closing argument, argued that Ford was "a very frightened woman." The record supports this inference. But the prosecutor went on:

> And it's unfortunate, really, that some people have to be on front street, you know, it's unfortunate we have to live in a society where certain people are permitted to be at liberty to frighten, to make miserable other people's lives. It's sad, okay? It's a quirk of our system. Maybe some day we'll remedy it. But this lady told you what she could, what she knew. Yet if she had said one thing substantially different, if she had said that men had come in there and dumped money on the floor to Mr. Harris, when he so graciously interviewed her in the presence of the defendant, is sure to lend itself to all kinds of free conversations. Don't you think you would have heard some contradiction, if she said anything different? If she had said, "Men came up there," if she had said at any point in time to him that the guy came up there to light her stove, don't you think you would have heard about it?

It is the latter argument defendant took exception to at trial and takes here. In this argument, defendant contends the prosecutor was saying "defendant intimidated this witness". We are not as convinced. Under our reading of the argument, it does not compel a conclusion the defendant intimidated Ford. However, if this conclusion were reached, we still would not reverse. We reverse a conviction for improper argument only if the complained of comments had a decisive effect on the jury's determination. *State v. Newlon*, 627 S.W.2d 606, 616 (Mo. banc 1982). Given the strong and compelling evidence of guilt here, we cannot say the jury's verdict was simply an inflamed response to closing argument. See *State v. Turner*, 633 S.W.2d 421, 428 (Mo.App., 1982).

Judgment affirmed.

CRANDALL, P.J., and PUDLOWSKI, J., concur.

## APPENDIX

MR. MOSS: What I need to know is if you know anything or heard anything about this particular crime situation, or know Mr. Kirksey himself, any of his family members, mother or brothers and sisters. I believe at some point in time they resided on Berkley in U City and I think over on Palm Avenue in the City of St. Louis. So if any of you know of any people personally or have heard about the family or anybody or the crime, let me know.

VENIREMAN RAY: Yes.

MR. MOSS: Okay. I take it these two people are the only ones over here that have any knowledge of the people whose names I've mentioned, or anything along those lines. Over here in the first row of six or the second row of three, do any of you know anything about the people I've mentioned at this point? Good. Mr. Ray, who do you think you know, or do you have a familiarity with the crime itself?

VENIREMAN RAY: Yes. I don't know any of the people, but I used to live over ther (sic) at 1968 West Pine, and I believe I was in the service station on the day of that robbery and before the robbery, and I have talked about it. I do kind of know a little bit about what happened. That's all I would like to say.

MR. MOSS: I believe Mr. Waghorn (Phonetic)—I believe I listed his name. Yes—worked that at the time. I don't know if

he's still working there. Did you converse with him about it at all?

VENIREMAN RAY: No.

MR. MOSS: Okay. My question is, knowing a little bit about it—obviously you were not there at the time, but knowing a little bit about it and maybe having discussed it, the question is did you form an opinion as to anyone's guilt or innocence as to, you know, any of the names mentioned? Did you form an opinion, yes or no?

VENIREMAN RAY: Yes.

MR. MOSS: Pardon me?

VENIREMAN RAY: Yes.

MR. MOSS: Now, that had to be, obviously, on what somebody else told you or what you read.

VENIREMAN RAY: Yes.

MR. MOSS: The question is, can you set aside that opinion and judge this case on the testimony and evidence you hear in the courtroom and not base any decision you might make upon hearsay, what you heard outside the courtroom? That's the question. You're supposed to do it that way. Some people can and some people can't. The question is could you set aside your—any former opinion you had and judge it on the witnesses and the physical exhibits you see?

VENIREMAN RAY: Yes.

\* \* \* \* \* \*

MR. HARRIS: Now, this question has already been asked, and I'm not going to harp on it, but Mr. Ray and well, he's the only one that is left. Mr. Ray has indicated he knows something about this crime. The crime did have a certain amount of publicity in both the Post, the Globe, the World, and the Crusader, if you read those newspapers. It also appeared on Channel 2, 4, and 5. Is there anyone here that after we've talked about it for a little while remembers anything more than you remembered earlier? You don't remember reading about the crime or hearing about it on the radio or television? Mr. Ray, you have indicated that your situation is slightly different than that which the others might have in hearing or reading about it. You go to that service station?

VENIREMAN RAY: Yes.

MR. HARRIS: And in fact had been at that service station prior to the robbery on the day it happened?

VENIREMAN RAY: Yes, sir.

MR. HARRIS: When you have gone back there on other occasions, you have talked to the people that were robbed?

VENIREMAN RAY: Well, no, sir, not about the case.

MR. HARRIS: Not about the case?

VENIREMAN RAY: You know, I might go in and ask for some gas, but I didn't talk with them about the case.

MR. HARRIS: I'm sorry, I did misunderstand you. I thought you had said that you had discussed the robbery with them a few days after it happened.

VENIREMAN RAY: No, sir. I discussed it with some neighbors who had gossiped.

MR. HARRIS: And you have discussed it with your neighbors?

VENIREMAN RAY: Yes, sir.

MR. HARRIS: You indicated that you had formed an opinion on this?

VENIREMAN RAY: Yes, sir.

MR. HARRIS: And you have your own feelings about the guilt or innocence of the defendant right now before we even start?

VENIREMAN RAY: Yes, sir.

MR. HARRIS: Your Honor, I would move that Mr. Ray be stricken for cause.

THE COURT: Do you wish to voir dire?

MR. MOSS: Not necessarily. He hasn't—I mean it has to go further than having an opinion. So at this point, no, I don't want to voir dire him.

THE COURT: I think you better ask a few more questions.

MR. HARRIS: Okay. You know what the instructions are going to be as far as burden of proof and reasonable doubt?

VENIREMAN RAY: Yes, sir.

MR. HARRIS: Are you going to require the State to use anything less than beyond a reasonable doubt in order to convict?

VENIREMAN RAY: Anything less or anything more? I don't understand what you mean by saying anything less.

MR. HARRIS: Are you going to make the State show anything less than full and complete guilt beyond a reasonable doubt before you would vote guilty?

VENIREMAN RAY: Yes, sir.

MR. HARRIS: You would?

VENIREMAN RAY: Yes, sir. Would I make them—would—you saying would I make—will I—would I already form an opinion, right?

MR. HARRIS: Yes.

VENIREMAN RAY: No, I wouldn't. I have an opinion, but I believe that I can sit down and listen to a case and, what you say, come to a conclusion—

MR. HARRIS: Okay.

VENIREMAN RAY:—about the case.

MR. HARRIS: Are you saying that one of us is going to have to make you change your opinion?

VENIREMAN RAY: Yes, sir.

MR. HARRIS: Okay. In that case, your Honor, I would once more ask that he be stricken for cause.

THE COURT: As I remember, in answer to a prior question you said that you can do—could do it?

VENIREMAN RAY: Yes, sir.

THE COURT: And that was your direct answer?

VENIREMAN RAY: Yes, sir.

THE COURT: So all we ask is that you put aside what you—any opinion you may have formed and be guided solely by the evidence as you heard it from the witness stand, together with the law that I will give you in the instructions. Do you believe that you could do that?

VENIREMAN RAY: Yes, sir.

THE COURT: You may proceed.

MR. HARRIS: Okay. I still make my motion.

THE COURT: It's overruled.