STATE of Missouri, Respondent,

v.

William B. HENDERSON, Appellant.

Nos. 57526, 59572.

Missouri Court of Appeals, Eastern District, Division Five.

Oct. 1, 1991.

**446**

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

Henry Robertson, Asst. Public Defender, St. Louis, for appellant.

SIMON, Judge.

■ Appellant appeals his convictions by a jury of first degree murder and armed criminal action, Sections 565.020 and 571.015 RSMo (1986), for which appellant was sentenced to consecutive terms of life without parole and life imprisonment. Appellant also appealed from the denial of his Rule 29.15 motion, but has apparently abandoned his appeal because his brief contains no points raised concerning the post conviction motion. We dismiss his Rule 29.15 motion appeal due to its abandonment. *State v. Mayo,* 784 S.W.2d 897[1] (Mo.App.1990).

On appeal, appellant asserts that the trial court erred in: (1) admitting into evidence the letter written by the victim because it was inadmissible hearsay and allowing the jury to view the letter during their deliberation; (2) refusing appellant's Instruction B defining "mental disease or defect" as any mental abnormality regardless of its medical label, origin, or source; (3) compelling disclosure of appellant's conversations with nurse-counselors at Hyland Center because they contained privileged communications and letting testimony of the conversations go to the jury on the issue of guilt; (4) overruling his motion to suppress his statements made to the police because the statements were involuntary in that he had made incriminating statements without benefit of the Miranda warnings and he was not taken before a magistrate as soon as practicable; and (5) granting leave to the state to file a second amended information. We affirm.

A brief recitation of the facts viewed in a light most favorable to the verdict is necessary. Around 2:30 a.m. on June 6, 1988, appellant called the nursing center at Hyland Center and told the nurse who answered the call that his wife was a prostitute, she had come home high on cocaine and he wanted her out of the house. Appellant said he had guns in the house and was afraid of what might happen. The nurse referred appellant to various counseling organizations and suggested he call a friend. Appellant called back at 5:10 a.m. Speaking to a second nurse, appellant stated he was going to shoot his wife and then kill himself because she had been sleeping with his friends for drugs. The nurse who had answered the first call talked to appellant once again. Appellant told her that he had made his wife write a letter and began to read the letter over the phone. The nurse heard a female whimpering in the background and then a "pop". Next, she heard appellant say, "I missed you this time, you bitch, but I'll get you next time." A second "pop" was heard and then appellant told the nurse, "I killed her", and that he was going to kill himself, and hung up. While appellant was on the phone, the nursing staff had traced the call and notified the police.

Appellant called the Jefferson County Sheriff's office at 5:30 a.m. and calmly

said, "I killed my wife". He gave his name, address and specific directions to his home. Appellant said he killed his wife because she had been "running around with some guys". He also told the police his two children were in the bedroom, and he was going to "shoot himself with dope". Appellant called the police back at 5:45 a.m. and continued to talk until police arrived at his home. When asked whether his wife was dead, appellant stated that he knew for a fact that she was dead because he had laid there until she died.

At appellant's house, the police found appellant sitting in a chair with a gun beside him. Appellant was handcuffed and transported to the hospital in an unconscious state. Appellant's wife was found dead on the floor in front of him. She had died from massive hemorrhaging having been shot once in the chest. Around her body, police found five pages of a letter signed by Rebecca Henderson and William Henderson which began, "To whom it may concern; Why my husband is going to kill me." A pen was found in the victim's hand and both the pen and several pages of the letter were stained with her blood.

Appellant had injected himself with chlordane, a pesticide, and was hospitalized for eight days during which appellant was guarded by police but not questioned. On June 14, 1988, detectives took appellant to the Jefferson County Sheriff's Department and read him his rights. Appellant stated he understood his rights but refused to allow the police to tape his statement. After appellant made a statement to police concerning the incident, he was taken to the circuit court. Other facts will be adduced as necessary.

In his first point, appellant claims the trial court erred in admitting into evidence the letter written by the victim. Overruling appellant's motion in limine, the trial court permitted the letter to be identified and referred to under the theory of res gestae. During trial, the letter was read and admitted into evidence. At that time, the trial court also stated the letter qualified as a dying declaration or an adoptive admission by the appellant. Appellant ar-

gues the letter was not within res gestae because it was not a spontaneous declaration nor did it qualify for any of the other exceptions under the hearsay rules. Respondent argues the letter was relevant, not for the truth of the matter asserted, but to corroborate appellant's statements to others demonstrating his deliberation.

Generally, the letter would be hearsay, but we find it admissible as an adoptive admission. One may expressly or implicitly adopt the statement of another as his own and such can constitute an admission of a party opponent. *State v. Laws*, 668 S.W.2d 234, 239[10] (Mo.App.1984). See also, Fed.R.Evid. 801(d)(2).

To establish the adoption of a hearsay statement sufficient to make it admissible as an adoptive admission, the state must show that the accused against whom the statement is offered had knowledge of the declarant's statements, and second, the accused, having such knowledge, has, by words or other conduct, manifested his adoption of it. 23 C.J.S. Criminal Law, Section 888 p. 100 (1989). See also McCormick on Evidence, 3rd Ed., Section 269 p. 797 (1984).

Here, appellant clearly admits knowledge of the contents of the letter and adopts it as his own. When appellant called Hyland Center a second time, the nurse who answered the phone heard appellant ordering his wife to "write." Then when the nurse who answered appellant's first call to Hyland was brought to the phone appellant told her that he made his wife write a letter containing the names of people she had slept with and he read part of the letter over the phone to her. The evidence therefore suggests appellant knew of the letter's contents. Additionally, the letter was found with appellant's signature and he later admitted to police that he signed the letter. Appellant had knowledge of the contents of the letter, he signed the letter, and later admitted signing the letter, thus manifesting his knowledge and adoption of the letter.

Appellant cites several cases to support his position, but they are distinguishable. In *State v. Cochran*, 356 Mo. 778, 203

S.W.2d 707, 713 (1947), the letter was clearly hearsay as the defendant had no knowledge of the letter's existence nor took any efforts to adopt it. In a California case, *People v. Maki*, 39 Cal.3d 707, 217 Cal. Rptr. 676, 704 P.2d 743, 746–8 (1985), invoices from a car rental agency with defendant's signature were not deemed adoptive admissions because it couldn't be shown that the defendant had read over the document before signing. Here, appellant took part in the writing of the letter, was heard telling his wife to write, and read parts of the letter over the phone. Finally, appellant refers to *State v. Orecchio*, 27 N.J.Super. 484, 99 A.2d 595, 602 (1953), where the court refused to assume the defendant had read the letters in question because they were not addressed to him and were found in a common office used by others. Here, the evidence clearly establishes appellant's participation and knowledge.

■ Appellant also claims that during deliberation, the jury was allowed to examine the letter for an impermissible reason, namely as a conclusion or opinion and for the victim's state of mind. The note from the jury stated, "We would like to see the letter written by Rebecca Henderson stating she was afraid for her life." The jury, in its request to view the letter, did not state an impermissible reason, but merely identified the letter. The jury had knowledge of the letter, its contents and the fact that it was stained with the victim's blood. The trial court did not err in allowing the jury to examine the letter.

In his second point, appellant claims the trial court erred in refusing appellant's Instruction B which defined "mental disease or defect" as meaning any mental abnormality regardless of its medical label, origin, or source. The trial court refused this instruction and gave Instruction 6, tracking MAI–CR 3d 308.03, which defined mental disease or defect to exclude "an abnormality manifested only by repeated antisocial conduct". Appellant claims this language was not supported by the evidence and allowed the jury to disregard appellant's evidence for impermissible reasons.

■ Appellant is presumed free of mental disease or defect excluding responsibility, and carries the burden to convince the jury, as the trier of fact, that the evidence substantially supports his acquittal under the defense of mental disease or defect. Section 552.030(6), RSMo 1986. *State v. Childers*, 791 S.W.2d 779, 781–2[1] (Mo. App.1990). Appellant points out that Dr. Cuneo, a defense witness, testified that appellant had a mental disease or defect and was in the manic phase of his bipolar disorder at the time of the crime. As respondent points out, however, Dr. Cuneo also testified that appellant displayed a pattern of irresponsible and antisocial behavior which had begun during childhood and has continued through adulthood. Dr. Cuneo stated that this behavior would be consistent with an individual suffering from a personality disorder including the elements of both an antisocial personality disorder and a borderline personality disorder. Thus, the record contains evidence suggesting the existence of both a mental disease or defect and an antisocial disorder.

■ When evidence of any parenthetical exception exists along with evidence of a mental disease or defect, the inclusion of the parenthetical serves to clarify the law for the jury by distinguishing between these conditions. *State v. Smith* 649 S.W.2d 417, 432[23] (Mo. banc 1983) (referring to MAI–CR 2d 2.32, which contains the same definitions and parenthetical exceptions as MAI–CR 3d 308.03). Since the record suggests evidence of both mental disease or defect and antisocial behavior, the trial court did not abuse its discretion when it included the parenthetical exempting anti-social behavior from the definition of mental disease. Point denied.

In his third point, appellant asserts the trial court erred in compelling disclosure of his conversations with nurse-counselors at Hyland Center. Appellant maintains he called Hyland Center for the purpose of seeking professional help and that his conversations with the nurses were protected by the physician-patient or psychologist-patient privilege. Section 491.060(5) RSMo Cum.Supp.1990, provides:

The following persons shall be incompetent to testify:

(5) A physician licensed under chapter 334, RSMo, a licensed psychologist or a dentist ... concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe and provide treatment for such patient as a physician, psychologist or dentist.

Also, Section 337.055, RSMo 1986 provides a provision protecting communications made to a licensed psychologist.

 Communications made to or in the presence of a nurse may be privileged if the nurse is acting under the direction of a physician or assisting him in his treatment. *State v. Scott*, 491 S.W.2d 514, 519[8][9] (Mo. banc 1973). Here, however, the nurses were not working under the direction of a doctor or psychologist. The physician-patient privilege applies only to those communications necessary to prescribe treatment, and the person claiming the privilege has the burden to show that necessity. *State v. Lewis*, 735 S.W.2d 183, 187[7–9] (Mo.App.1987). Appellant never established a physician-patient relationship because he never sought treatment. The nurses at Hyland did not suggest or refer appellant to a doctor or psychologist within Hyland, but only gave appellant some phone numbers for Legal Assistance, Family Counseling and Al–Anon and suggested that he call a friend. At trial, the nurses testified that it clearly was not standard procedure to refer patients to doctors at Hyland. In addition, no records or files for the hospital were kept. The nurse answering the call only made and kept personal notes. Examining the disclosures of the conversations reveals that appellant was not seeking medical assistance. Apparently, appellant was looking for a forum for expressing his motives for the killing. Clearly, no physician-patient relationship was established. Appellant also claims the use of the statements should have been limited to prove mental capacity. Having concluded that no privilege existed, this claim is without merit.

In his fourth point, appellant contends the trial court abused its discretion in overruling his motion to suppress statements made to detectives. Appellant argues that his statement to Detective Harris was involuntary because an initial statement to Deputy Garrison at the hospital "contributed to a statement made later the same day" to Detective Harris, and that the police should have applied for a warrant within 20 hours of arrest and taken him before a judge as soon as practicable.

Following his arrest, appellant was transported from the scene of the crime unconscious and remained hospitalized under guard for eight days. Appellant was never questioned by police while at the hospital, but at one point appellant began asking Deputy Garrison questions. When appellant referred to the poison he had taken and that he did not expect to live, Garrison ended the conversation. Appellant now claims these statements were a product of a custodial interrogation without the benefit of the Miranda warnings. While these statements were not introduced into evidence, appellant asserts that these statements to Garrison contributed to the statement made later to Detective Harris which was introduced into evidence.

 "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222[12] (1985). Here, appellant fails to provide any indication of deliberately coercive tactics by Deputy Garrison who ended the conversation when appellant referred to poison he had taken and that he did not expect to live. The record suggests that appellant's statements to Harris were voluntary and cumulative of all other statements made by appellant. Evidence throughout showed that appellant wanted his reasons for killing his wife to be known. The record clearly indicates the police followed proper procedures. The complaint and arrest warrant were filed on June 6, 1988. Upon release from the hospital on June 14, 1988, appel-

lant was taken to the Jefferson County Sheriff's Department where he was advised of his Miranda rights. Appellant indicated he understood his rights and proceeded to give an incriminating statement to the detectives concerning why and how he killed his wife. Afterwards, on that same day, appellant appeared before the associate circuit court.

Whether a confession is voluntary depends upon the totality of the circumstances, and failure to produce a prisoner before the judge as soon as practicable is a factor to be considered in determining whether there has been physical or psychological coercion. *State v. Smith* 588 S.W.2d 27, 31[2, 3] (Mo.App.1979). There is no indication in the record that appellant was detained at the Sheriff's Department for an unreasonable length of time. The only reference to time was that the interview took place in the afternoon and lasted approximately one hour. We find no evidence of coercion. Further, the appellant does not indicate how the delay, if any, affected the voluntariness of his statements. In any event, considering the evidence and the statements by appellant at the time of the shooting, the statements made to Detective Harris were cumulative. Point denied.

In his final point, appellant asserts that the trial court erred in granting leave for the state to file a second amended information. Appellant was originally charged with murder in the first degree and received a preliminary hearing on this charge. Pursuant to plea negotiations, the state filed an amended information reducing the charge to second degree murder, but negotiations failed. On the first day of trial, the state filed a second amended information reinstating the first degree murder charge and adding a prior and persistent offender charge. Appellant claims the amended information charged a different offense and prejudiced appellant's substantial rights.

An information may be amended at the discretion of the trial court at any time before trial. *State v. Mason,* 650 S.W.2d 15, 16[2, 3] (Mo.App.1983). The test for prejudice under this rule is wheth-er a defendant's evidence would be equally applicable, and his defense equally available, after the amendment. *State v. Wilson,* 544 S.W.2d 859, 862[1–3] (Mo.App. 1976). In this case, appellant received a preliminary hearing on the first degree murder charge, was fully informed of the charges against him before trial and was able to prepare a defense against it. The amended charge did not alter or limit appellant's original defense and evidence. Appellant has failed to show how he was prejudiced. Point denied.

Judgment affirmed.

CARL R. GAERTNER, C.J., and CRANE, J., concur.