**STATE of Missouri, Plaintiff–Respondent,**

v.

**Doyle SAPPINGTON, Defendant–Appellant.**

**Doyle SAPPINGTON, Plaintiff–Respondent,**

v.

**STATE of Missouri, Defendant–Appellant.**

Nos. 17995, 18573.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 24, 1994.

Motion for Rehearing or Transfer to Supreme Court Denied March 17, 1994.

Dee Wampler, Wampler, Wampler & Catt, Springfield, for defendant-appellant/plaintiff-respondent.

Jeremiah W. (Jay) Nixon, Atty. Gen., Hugh L. Marshall, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent/defendant-appellant.

PARRISH, Chief Judge.

Doyle "Sam" Sappington (defendant) was convicted, following a jury trial, of unlawful use of a weapon, § 571.030.1(3),[1] (Count I), and armed criminal action, § 571.015, (Count II). He was sentenced to concurrent terms of imprisonment of 5 years and 15 years. Defendant filed a motion for post-conviction relief pursuant to Rule 29.15. Following an evidentiary hearing, the motion court granted his Rule 29.15 motion and ordered the judgment and sentence in the criminal case set aside.

Defendant appeals the judgment and conviction in the criminal case (No. 17995). The state appeals the order granting the Rule 29.15 motion (No. 18573). The appeals were consolidated pursuant to Rule 29.15(*l*). This court affirms the judgment and sentence in No. 17995. The order in No. 18573 setting aside the conviction and sentence is reversed and that case remanded.

## No. 17995

For purposes of appellate review, all evidence that tends to prove defendant's guilt, together with all reasonable inferences that support the verdict of the jury, is accepted as true. *State v. Barber*, 635 S.W.2d 342, 343 (Mo.1982). Evidence contrary to the verdict is disregarded. *State v. Brooks*, 618 S.W.2d 22, 23 (Mo. banc 1981).

*State v. Hicks*, 803 S.W.2d 143, 144 (Mo.App. 1991).

On the evening of April 20, 1991, defendant and Karon Olson met at a bar at the Neosho Inn. Defendant arrived about 10:00 p.m.

Mr. Olson arrived later. Defendant was drinking beer before Olson arrived. After Mr. Olson arrived, they "had a beer together and [they] talked." They left the Neosho Inn together about an hour after Mr. Olson arrived ("if that long") in Olson's truck. They got "three six-packs" of beer and traveled to defendant's residence—defendant needed to check on his son. Another man, Everett Franks, was with them.

Defendant and Karon Olson left defendant's house about 20 minutes later. They took two shotguns that belonged to defendant, together with ammunition. One was a .410 and the other a 20–gauge. They put the shotguns in Olson's truck and drove away. The third man, Everett Franks, did not accompany them.

Defendant and Mr. Olson went to the residence of David Clanton. It was about 2:45 a.m. the morning of April 21, 1991, when they arrived. Mr. Clanton was asleep in his house. His two sons, ages 10 and 11, were also there.

Clanton was awakened by the sound of Olson's pickup. He went to the front door of his house and looked outside. He saw Olson's truck. The passenger side of the pickup was toward the house. Mr. Clanton started through the house "to get some clothes on." A light was turned on in the kitchen. As Clanton walked through the kitchen a shot was fired through the kitchen window. Clanton "turned and went right back out the front door." He saw "a two-toned Chevrolet or GMC truck pull right down to the front door." He described what happened:

Q. [By the prosecuting attorney] All right. Down to the front door at this point. All right. What did you do?

A. I opened the door—Or I was already outside, and the light—when they pulled up beside of me, the light shined right in the passenger's face.

Q. Who was the passenger?

A. Sam Sappington.

Q. All right. Have any trouble recognizing him at all?

A. No. The light—

---

1. References to statutes are to RSMo 1986.

Q. Could you see the driver at this point? Could you see him?

A. No, I couldn't.

Q. Okay. What did you do?

A. I said, "Sam Sappington"—I recognized him and I asked him, well, what was he doing at my house in the middle of the night shooting my windows out.

Q. Okay. What did he say?

A. He didn't say anything.

Q. All right.

A. He turned—Well, now, for a moment he didn't say nothing. Then he turned and he looked at the passenger or the driver and he said, "Let's go. Let's go right now."

Q. What did you do?

A. I told the boys, I said, "You boys— You guys just better sit right here. You're in a lot of trouble."

Q. All right. Then what happened?

A. I turned, went and stepped back inside the house, closed the door behind me and took about two steps and a shotgun blast come through the door and hit me in the back.

Q. All right. How many shotgun blasts?

A. I was hit by about four pellets. Most of the pattern—

Q. I'm sorry. Let me—Let me ask that question again. How many shotgun blasts came through that door[?]

A. Two blasts.

.    .    .    .    .

Q. How long from the time that you got up and looked out the front door till the whole thing was over with?

A. Probably about three minutes, two minutes.

Personnel from the Newton County Sheriff's department were sent to the Clanton residence after the shooting. They checked for evidence on the premises. A spent 20–gauge shotgun shell casing was found outside the front door area at Mr. Clanton's house together with "two plastic shell cups or wadding cups from the shotgun shell."

Defendant and Olson were arrested later the morning of April 21. They were in Olson's pickup. A "spent 20–gauge Federal shotgun hull that was the same kind as the one found outside the door at [Clanton's] house" was found inside the pickup. It was on the passenger's side of the truck, underneath the passenger's seat next to the door. A .410 single-shot shotgun and a 20–gauge pump action shotgun were in the truck.

Defendant's first point in his appeal from the criminal conviction is directed to the trial court's failure to declare a mistrial or grant a continuance because the state failed to timely produce "exculpatory evidence" in response to defendant's request for disclosure. Defendant contends that the trial court's failure to grant his motion for mistrial or continuance was error. He argues that the state failed "to timely produce exculpatory evidence" and that this failure "rendered [his] conviction fundamentally unfair."

Defendant timely filed a request for disclosure as permitted by Rule 25.03. Among the information requested was:

Any written or recorded statements and the substance of any oral statements made by the Defendant or by a Co–Defendant, a list of all witnesses to the making, and a list of all witnesses to the acknowledgment of such statements, and the last known addresses of such witnesses.

Defendant also requested:

Any material information, within the possession or control of the state, which tends to negate the guilt of the Defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment.

The request was filed June 4, 1991.

The state responded to defendant's request for disclosure on July 18, 1991. The response included a list of witnesses. Included on that list was "Karon Olson." The response stated, "The State does not possess nor is in control of any material or information which tends to negate the guilt of the defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment."

The criminal case was set for trial December 10, 1991. On December 4, defendant's attorneys filed a motion requesting the trial court to require "additional disclosure . . . and for sanctions for failure to properly answer Defendant's prior written request for disclosure." The motion alleged that the state had listed Karon Olson as a witness; that Karon Olson had refused to testify at the preliminary hearing in the case. The motion stated that defendant believed the state had entered into a negotiated plea agreement with Olson, and that defendant was entitled "to know the nature, extent and specifics of the plea bargain, if any, and the charge or charges if any, to which the said Karon Olson has or will plead guilty." The motion requested the trial court to "make and enter its Order requiring [the state] to fully and completely answer Defendant's Request for Disclosure. . . ."

On Friday, December 6, 1991, the prosecuting attorney provided defendant's attorney with a copy of an unsigned plea agreement with Karon Olson. On December 9, the day before trial, the state delivered to defendant's attorney a "Supplementary Investigation Report" that revealed that a gunshot residue test was performed on defendant at the time of his arrest.

On the day of trial the prosecuting attorney produced a transcript of what was represented to be an oral statement of Karon Olson in which he responded to questions asked of him by a highway patrolman. The top of the first page of the transcript states:

From: Karon Olsen [sic]

Place: Newton County Sheriff's Department Law Library

Time: 0810 hours

Date: 04–21–91

Present: State Trooper Cpl. Jerry Walters
Deputy Larry Scott
Reporting officer, Deputy Ted Meador

Suspect: Karon Olsen [sic]

The transcript includes the following questions and answers:

Q. Tell us what happened when you left the Sappington's residence? [sic]

A. I don't know what happened. I don't remember.

Q. You don't remember?

A. No.

Q. Ok, tell us what happened when you arrived at the Clanton residence? [sic]

A. Who's Clanton? I don't even know who that is? [sic]

Q. Did you go to a residence around the Boulder City area around 3:00 o'clock this morning?

A. I don't—I was lost down those back roads. I didn't even know where I was going.

Q. Who was with you when you were driving around the back roads?

A. Sam—

Q. Doyle Sappington and yourself?

A. Yes, but I don't know where I was at.

Q. Ok, tell us about the—when the shooting took place? [sic]

A. I don't know anything about it. I just, I, I done it all, how's that. Let me, I'll take the bad boy.

Q. Tell us what happened at the house of the shooting? [sic]

A. Nothing, nothing that I know of.

Q. Then what are you taking the blame for?

A. Cause I don't.

Q. Cause you did what?

A. Whatever you're charging me.

.    .    .    .    .

Q. Where did the guns come from and who do the guns belong to in the truck?

A. I don't know, I don't own a gun. My gun, I've got a black powder rifle and it's here in the courthouse, that's it. That's the only gun I've got, is a black powder rifle. I don't have any guns.

.    .    .    .    .

Q. What we're going to do is when we get done with this investigation, are you willing to take a polygraph?

A. Yeh.

Q. What?

A. Yeh, I'll, I done the shooting.

.    .    .    .    .

A. Well Sam's a good person. I done the shootings, I ah [inaudible]

Q. But, that doesn't add up. You don't know nothing about what occurred to talk about—

A. Well, I don't remember cause we was both, you know, Sam didn't do nothing wrong that I know of. Sam didn't do nothing.

Q. Alleging that you did fire a weapon, alright, what kind of weapon did you fire?

A. Shotgun.

.    .    .    .    .

Q. Do you know what type of shotgun?

A. (Not audible at all)

.    .    .    .    .

Q. Mr. Olsen [sic], you were aware that this conversation was being taped and that no threats, coercions or promises were being made to you?

A. Yes sir.

Defendant's trial attorney[2] told the trial court:

> I was handed this [the transcript of the interview with Mr. Olson] this morning [the day of trial] at, oh, sometime around 9:00. I wasn't aware of it until this morning at 9:00. I assure you, had I received one before 9:00, I would have at least attempted to take his deposition prior to today, particularly, in view of Defendant's Exhibit C [the unsigned negotiated plea agreement], which was also delivered to me last Friday.

The prosecuting attorney told the court that witness Olson would "plead the Fifth Amendment" if called to testify at defendant's criminal trial. He asked the trial court to not allow defendant's trial attorney to call Mr. Olson as a witness. The trial court denied the request to preclude defendant from calling Mr. Olson as a witness.

Defense counsel called Karon Olson as a witness. Mr. Olson refused to testify. The attorney then requested and was permitted to read a transcript of the limited testimony Mr. Olson gave at preliminary hearing.[3] The defense attorney also advised the trial court, "The fact is and I'd offer into evidence Defendant's Exhibit C [the unsigned negotiated plea agreement] or ask the Court to take judicial notice of it as part of the disclosure in the court file which was given ... and represented ... to be a plea bargain agreement whereby this man [Mr. Olson] would testify."

Based on Mr. Olson's failure to testify, defendant's trial attorney requested the trial court to declare mistrial. The trial court denied the request. Defendant's trial attorney then again asked the trial court to take judicial notice of Defendant's Exhibit C and Defendant's Exhibit B, the transcript of Mr. Olson's statement. The trial court granted the request.

■ Defendant's complaints about the state's failure to timely respond to requests for disclosure are directed to the prosecuting attorney's failure to timely provide Karon Olson's statement, Defendant's Exhibit B, failure to timely provide the unsigned negotiated plea agreement, Defendant's Exhibit C, and failure to disclose "the results of a gunshot residue test to Mr. Sappington [until] the day before trial." Defendant contends, regarding the gunshot residue test, "This test was also exculpatory in nature in that the test was inconclusive as to whether Mr. Sappington had fired a weapon on the night in question."

> Although discovery process in criminal proceedings is not compelled by either federal or state constitutional requirements, the basic object of such process, insofar as a defendant is concerned, is to permit defendant a decent opportunity to prepare in advance of trial and avoid surprise, thus, extending to him fundamental fairness which the adversary system aims to pro-

---

2. The attorney representing defendant in this appeal did not represent him at trial.

3. Mr. Olson exercised his Fifth Amendment rights at preliminary hearing; however, he answered some preliminary questions regarding his identity and that he was with defendant the eve- ning of April 21, 1991. Mr. Olson was also asked, at preliminary hearing, if he had been charged with "the identical charges that Sam has." He answered, "Yes." This was read to the jury in defendant's criminal trial.

vide. *State v. Johnson,* 524 S.W.2d 97, 101 (Mo. banc 1975).

*State v. Sykes,* 628 S.W.2d 653, 656 (Mo. 1982). "[T]he duty to disclose is placed upon the prosecutor. *State v. Dayton,* [535 S.W.2d 469, 477 (Mo.App.1976)]. Even in the absence of a request, the prosecutor has an affirmative duty to disclose exculpatory evidence." *State v. Bebee,* 577 S.W.2d 658, 661 (Mo.App.1979). However, failure to disclose does not, in and of itself, entitle a defendant to a new trial. *Id.*

In this case, the prosecuting attorney did not receive the information about which defendant complains until shortly before the information was given to defendant's attorney. The prosecutor offered the following explanation of his tardiness in complying with defendant's disclosure requests:

I received my first officer report last Friday. I received a second one yesterday and immediately delivered it to [defendant's trial attorney]. That's the first time I talked to [Deputy Sheriff] Ted Meador about it. So I haven't closeted anybody. It's just simply the fact that they got them as soon as I did. I didn't even know a gunshot residue test was performed until yesterday because all these records were mis—dis—or dislocated—not lost but were not put in their proper place for the entire month of April, according to the police— according to the sheriff's department.

There was no showing that the tardiness in disclosing information to defendant was intentional on the part of the prosecuting attorney. As such:

The question to be decided is whether or not the failure to produce as required by the rules results in a fundamental unfairness to the defendant. *State v. Moten,* [542 S.W.2d 317 (Mo.App.1976)]; *State v. Buckner,* [526 S.W.2d 387 (Mo.App.1975)]; *State v. Johnson,* [524 S.W.2d 97 (Mo. banc 1975)]; *State v. Mitchell,* 500 S.W.2d 320 (Mo.App.1973). Whether prejudice results in any given case from the State's failure to produce, upon request, evidence favorable to the defense depends upon the nature of the charge, the evidence presented by the State, and the role that nonproduced evidence would likely have played.

*State v. Dayton,* 535 S.W.2d 469 (Mo.App. 1976). The nonproduced evidence must be of a character to raise a reasonable likelihood that it would have affected the result, if known at the trial. *State v. Dayton, supra.*

*State v. Helms,* 559 S.W.2d 587, 590 (Mo.App. 1977).

Unlike in *Helms,* the evidence about which defendant complains was known to defendant at trial. Defendant's complaint is that it was disclosed such a short time prior to trial his attorney did not have sufficient time to take advantage of it in trial preparation.

■ Defendant's first complaint is that the state failed to timely provide his trial attorney with the transcript of Karon Olson's statement. Defendant's trial attorney stated that he would have deposed Mr. Olson had he known of the statement in time to do so. There is no indication, however, that a prior deposition would have produced testimony. Olson could have claimed his right against self-incrimination in the course of a deposition just as he did when his testimony was sought at preliminary hearing and at trial. Under these circumstances, the failure to timely produce the transcript of Olson's statement did not affect the charge filed against defendant.

The statement had no effect on the evidence the state produced. There is no indication that the conduct and outcome of the trial would have been different if Olson's statement had been forthcoming at the earlier appropriate time. This court finds no prejudice to defendant due to the state's tardiness in disclosing Mr. Olson's statement and providing a copy of its transcription.

■ The next item about which defendant complains is Defendant's Exhibit C, the unsigned negotiated plea agreement. Since the agreement was not consummated, it affected neither the nature of the charge nor the evidence adduced by the state. It was not material to defendant's criminal case. It had no bearing on the result reached.

■ The remaining item for consideration is the results of a gunshot residue test performed on defendant at the time of his ar-

rest. The nature of the charge was not affected; the evidence was undisputed that gunshots were fired into the house. Since the state did not offer evidence of the test or its results, the state's case was not affected.

Would it have affected the outcome of the trial if defendant had known about the test results at an earlier time? Defendant's trial attorney received the report the day before the trial. He talked to the forensic expert who prepared it, a Dr. Whittle, the evening before the trial. The attorney's assessment of the report was, "[I]t seems to me the report indicates that the metal levels were not elevated enough to allow any conclusion as to whether or not the Defendant had fired the weapon." Immediately prior to trial, defendant's trial attorney suggested, "If we can simply enter into a stipulation that a gunshot residue test was done on the Defendant and that the results of that test were there wasn't a sufficient elevation of metals for the examiner to conclude that he had fired a weapon, that would be sufficient for me rather than having Dr. Whittle come down here. But I don't mind having Dr. Whittle come down here."

The prosecuting attorney responded that if there was going to be evidence regarding the gunshot residue test, the forensic expert would need to be present. He reasoned:

> Because Whittle will testify that on a shotgun, unless you to [do?] it immediately—and even then, if—if the defendant has rubbed his hands together or wiped them off at any point—a shotgun residue test is worthless. That on a handgun it's much different. But on a shotgun, particularly, even if three or four hours have passed, which they did, this test is worthless. So we either have to exclude the test completely or bring Whittle in.

After further dialogue, the trial court and the attorneys completed the discussion:

> [PROSECUTING ATTORNEY]: That's not—if—If there's a fault, it's my fault because I just simply did not have the discovery available. But I—I really did turn it over as soon as I got it.
>
> THE COURT: Well, what I hear the Prosecutor saying, is he may or may not try to introduce it into evidence. He may or may not call Dr. Whittle.
>
> [PROSECUTING ATTORNEY]: I will not. But if he is going to reference a residue test, then I'll tell—I'll get Whittle up there to say it wasn't any good. But if he's not going to reference the residue test, I'm not going to.
>
> THE COURT: Gentlemen, can you work it out between yourselves?
>
> [DEFENDANT'S TRIAL ATTORNEY]: Can I wait and see how the rest of the stuff develops this morning on—
>
> THE COURT: Sure. That would be fine.

The record on appeal has no further reference to the gunshot residue test. Dr. Whittle did not testify.

The state offered to have the analyst available to testify about the gunshot residue test. Defendant did not avail himself of that offer nor did defendant indicate that other expert analysis was desired. The lateness of the state's production of the residue test did not affect the nature of the charge. It did not affect the evidence the state presented. The test played no role in the trial. The untimely response to the request to produce did not affect the results of the trial.

"The question of the remedy for violation of the discovery rules lies within the sound discretion of the trial court. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc 1989)." *State v. Metts*, 829 S.W.2d 585, 588 (Mo.App.1992). Abuse of trial court discretion occurs only when the state's failure to disclose evidence affected the result of a trial by unduly hindering the defendant. *Id.* at 589. The record does not support that conclusion in this case. Defendant's first point is denied.

■ Defendant's second point is directed to the trial court allowing the state to amend Count II of its information one day prior to trial. Count II was amended to make it consistent with the amended Count I.

Count I originally charged defendant with assault in the first degree in violation of § 565.050 or, alternatively, with unlawful use of a weapon in violation of § 571.030.1(3). Count II originally charged defendant with armed criminal action in violation of § 571.-

015.1, predicated on assault in the first degree.

The day before trial was scheduled to begin, the state elected to proceed on the alternate charge, the charge of unlawful use of a weapon. It filed an amended information for that purpose. Count I of the amended information charged the offense of unlawful use of a weapon. It alleged that defendant "knowingly shot a firearm into a dwelling house," the same allegation that was in the alternate charge in Count I of the original information. Count II was amended to charge armed criminal action predicated on the offense of unlawful use of a weapon "as charged in Count I."

Defendant's second point asserts that Count II of the amended information was a different offense than the one originally charged; that the amendment violated Rule 23.08. *See State v. Greathouse,* 789 S.W.2d 50, 52 (Mo.App.1990); and *State v. Robertson,* 764 S.W.2d 483, 484–85 (Mo.App.1989).

Rule 23.08 provides:

Any information may be amended or substituted for an indictment at any time before verdict or finding if no additional or different offense is charged and if a defendant's substantial rights are not thereby prejudiced. No such amendment or substitution shall cause delay of a trial unless the court finds that a defendant needs further time to prepare his defense by reason of such amendment or substitution.

■ Armed criminal action as established by § 571.015 authorizes cumulative punishments for certain offenses committed with deadly weapons or dangerous instruments. *State v. Kirksey,* 725 S.W.2d 611, 615 (Mo. App.1987). When the state amended Count I, the original Count II became erroneous. The original Count II addressed facts applicable to the offense of assault in the first degree, an offense no longer charged. Count

II was amended to be consistent with the amended Count I.

■ The state is entitled to correct allegations in informations charging armed criminal action. *State v. Maynard,* 707 S.W.2d 810, 812–13 (Mo.App.1986). When an amendment is allowed pursuant to Rule 23.-08, "[t]he test for prejudice ... is whether a defendant's evidence would be equally applicable, and his defense equally available, after the amendment." *State v. Henderson,* 824 S.W.2d 445, 451 (Mo.App.1991). Under the facts in this case, after Count II was amended, defendant's evidence and defense would be equally applicable. Defendant's second point is denied.

*No. 18573*

■ Following an evidentiary hearing on defendant's Rule 29.15 motion, the motion court entered an order directing "that the jury verdict of December 10, 1991 should be and hereby is vacated, set aside and held for naught." No findings of facts or conclusions of law are included in the legal file. The copies of the docket sheets in the legal file do not reflect that findings of fact and conclusions of law were filed.[4]

■ Rule 29.15(i) requires the motion court to "issue findings of fact and conclusions of law on all issues presented, whether or not a hearing is held, within thirty days of the submission of the case." "Appellate review of the trial court's action on the motion filed under ... Rule 29.15 shall be limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." Rule 29.15(j). "In order for the appellate courts to engage in review of post-conviction proceedings, the motion court is required to make findings of fact and conclusions of law on all issues presented." *State v. Williams,* 861 S.W.2d 670, 679 (Mo.App. 1993). A mere recital that the motion, files and records show a movant is not entitled to

---

4. The pleadings in this case were included in the circuit court file for the underlying criminal case. The record on appeal does not reflect that a separate case number was assigned to the Rule 29.15 motion. The motion court's entries were made on the docket sheets in the criminal case. That procedure was incorrect. The filing of a

motion for post-conviction relief pursuant to Rule 29.15 (as well as Rule 24.035) constitutes the commencement of a civil action. *Lewis v. State,* 845 S.W.2d 137, 138 (Mo.App.1993); *Cowans v. State,* 778 S.W.2d 758, 762 (Mo.App. 1989).

relief is not sufficient to permit appellate review. *See Barry v. State*, 850 S.W.2d 348, 350 (Mo. banc 1993). An appellate court will not supply findings and conclusions "by implication." *Id. See also, Fields v. State*, 572 S.W.2d 477, 483 (Mo. banc 1978); and *Lewis v. State*, 845 S.W.2d 137, 139 (Mo.App.1993).

The appeal in No. 18573 provides nothing for appellate review. The motion court failed to comply with the requirements of Rule 29.15(i). *Barry v. State, supra.*

### Dispositions

The judgment and sentence in No. 17995 are affirmed. The judgment in No. 18573 is reversed and the case remanded for the motion court to comply with Rule 29.15(i). The motion court is directed to file written findings of fact and conclusions of law within 30 days of the filing of a mandate in this case.

SHRUM and MONTGOMERY, JJ., concur.